FILED

2025 Mar-28  PM 05:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **AIR ENGINEERS LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:24-cv-01461-NAD** |
| | ) | |
| **TRIUMPH JETS LLC and GLOBAL** | ) | **JURY TRIAL DEMANDED** |
| **CROSSING AIRLINES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**AMENDED COMPLAINT**

In accordance with the Court's March 6, 2025 Order (Doc. 41), Plaintiff, Air Engineers

LLC ("Air Engineers"), submits the following Amended Complaint against Defendants Triumph

Jets LLC ("Triumph Jets") and Global Crossing Airlines, Inc. ("Global X"), stating as follows:

1.      This Amended Complaint arises out of arrangements for round-trip international

air travel originating at the Birmingham-Shuttlesworth International Airport ("BHM"). By the time

of the return trip, Triumph Jets itself called the travel an "absolute shit show."

**Parties, Jurisdiction, & Venue**

2.      Plaintiff Air Engineers is an Alabama limited liability company and has its principal

place of business in Shelby County, Alabama.

3.      On information and belief, Defendant Triumph Jets is a limited liability company

formed under Florida law and has its principal place of business in Florida.

4.      On information and belief, Defendant Global X is a corporation formed under

Delaware law and has its principal place of business in Florida.

5.      This Court has jurisdiction under 28 U.S.C. § 1331. As of the hearing held on March

5, 2025, both Defendants had conceded that the claims in this case arise under a certain treaty

entered into by the United States. This treaty is commonly known as the "Montreal Convention," formally the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, T.I.A.S. 13038, 2242 U.N.T.S. 309.

6.    Article 33, paragraph 1, of the Convention provides that "An action for damages must be brought, at the option of the plaintiff, in the territory of one of the State Parties … before the court at the place of destination."

7.    For purposes of Article 33, paragraph 1, BHM is a place of destination for the international air travel at issue. Therefore, this Court has jurisdiction under Article 33 of the Montreal Convention.

8.    This Court also has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

9.    Triumph Jets had previously removed this action from state court to this Court and asserted that this Court has jurisdiction over this action under 28 U.S.C. § 1332. Air Engineers had disputed that Triumph Jets' Notice of Removal (Doc. 1) sufficed to show diversity jurisdiction and moved to remand. The Court's March 6, 2025 Order (Doc. 41) denied Air Engineers' Motion to Remand (Doc. 14). To the extent those arguments are not mooted by Air Engineers' present assertions of federal-question jurisdiction based on the Montreal Convention, Air Engineers reserves and does not waive, for purposes of any future appeal, the arguments it made in its Motion to Remand denied by this Court.

10.    The Court has personal jurisdiction over both Triumph Jets and Global X because they directed their business activities at the State of Alabama by making arrangements with Air Engineers and its passengers for international flights to and from BHM.

11.    Venue is proper in this Court because BHM is located in this district and division and because a substantial part of the events and omissions giving rise to this claim occurred in this district and division.

### Factual Allegations

### Facts Part 1:
### Air Engineers Pays Almost a Quarter of a Million Dollars to Charter an Airbus A320 Aircraft for Roundtrip Travel to and from the Dominican Republic and Invites Customer Representatives to Join Air Engineers Representatives on the Trip

12.    Air Engineers is in the business of distributing HVAC systems, generators, and component parts to dealers who sell and install these systems and parts to commercial and residential end-users.

13.    These dealers are Air Engineers' customers, and they are located throughout Alabama and in the Florida panhandle.

14.    Periodically, Air Engineers arranges trips for principals and management of its top customers. These trips allow the customer representatives to spend a few days at a resort destination.

15.    Such trips not only enable Air Engineers to show its appreciation of its customers and their business over the years; the trips also provide customers the opportunity to learn about and discuss various products and developments in the industry.

16.    The trips are announced well in advance, since customers have to meet certain sales metrics in order for their principals and/or managers to participate in the trip.

17.    In addition to inviting customers on these trips, Air Engineers also invites representatives of HVAC manufacturers to join these trips. Having representatives of the HVAC manufacturers present allows Air Engineers' customers to hear first-hand from HVAC manufacturers about various products and developments in the industry.

18.     The trip that Air Engineers was planning for April 2024 was extra special, in that Air Engineers intended to book four nights at the Casa de Campo resort in the Dominican Republic.

19.     The logistics of getting customer representatives to the Casa de Campo resort in the Dominican Republic seemed daunting at first.

20.     Notably, some of Air Engineers' customers have principals who are age 70 and older, and Air Engineers wished to make the logistics of international air travel for its customer representatives as easy and as stress-free as possible.

21.     Fortunately, there is an international airport a 10-minute drive away from the Casa de Campo resort: the La Romana International Airport ("LRM").

22.     However, there are no commercial flights that fly direct from anywhere in Alabama or the Florida panhandle to LRM in the Dominican Republic.

23.     Accordingly, Air Engineers looked into chartering direct, round-trip flights between BHM and LRM.

24.     Air Engineers received a one-page estimate (Quote 1686) from Triumph Jets dated November 13, 2023.

25.     This quote bears the name "Triumph Jets / Big Game Air." The website for "Big Game Air" explains that "Big Game Air is a premier provider of luxury game day travel experiences for the ultimate sports fan."

26.     Quote 1686 was accompanied by a proposed "Air Charter Agreement" between Triumph Jets and Air Engineers back-dated as of August 21, 2023 and an "Annex" back-dated as of November 6, 2023.[1]

---

[1] Confusingly, the "Annex" refers to an "Air Charter Agreement of August **20**, 2023" (emphasis added), but the actual "Air Charter Agreement" is dated August **21**, 2023.

27.    Quote 1686 represented that Triumph Jets could arrange for Airbus A320 aircraft to fly direct from Birmingham, Alabama, USA to La Romana, Dominican Republic on April 24, 2024, with return, direct travel on April 28, 2024.

28.    Per Quote 1686, both the out-going and the return direct flights were estimated to take 3 hours and 11 minutes.

29.    Under "Annex" back-dated as of November 6, 2023, the out-going trip was estimated to take 3 hours and 20 minutes, and the return trip was estimated to take 3 hours and 50 minutes.

30.    On information and belief, it would be not be possible to make the out-going flight in less than 4 hours if the flight were not a direct flight.

31.    Likewise, on information and belief, it would not be possible make the return flight in less than 4 hours if the flight hours were not a direct flight.

32.    In no event would it be possible to depart LRM, land at a US airport other than BHM, have all crew and passengers processed by Customs and Border Protection at this other US airport, and then depart from this other US airport and arrive in BHM in less than 4 hours.

33.    Thus, in providing the time estimates in Quote 1686 and in the "Annex" back-dated as of November 6, 2023, Triumph Jets was representing that it would be possible to fly direct, round-trip between BHM and LRM.

34.    The total price for chartering Airbus A320 aircraft for the direct, round-trip flights was $225,434.68.

35.    Nothing in Quote 1686 disclosed that Customs and Border Protection agents at BHM typically only worked Mondays through Friday, and nothing in Quote 1686 disclosed that

any special arrangements would need to be made in order for Customs and Border Protection agents to meet an international flight arriving at BHM on a Sunday.

36.    Likewise, nothing in the "Air Charter Agreement" or its back-dated "Annex" disclosed that Customs and Border Protection agents at BHM typically only worked Mondays through Friday, and nothing in the "Air Charter Agreement" or its back-dated "Annex" disclosed that any special arrangements would need to be made in order for Customs and Border Protection agents to meet an international flight arriving at BHM on a Sunday.

37.    Had Triumph Jets not provided Air Engineers with Quote 1686 and had Triumph Jets not represented to Air Engineers that direct, round-trip travel between BHM and LRM would be possible on the dates of April 24, 2024 (out-going flight) and April 28, 2024 (return flight), Air Engineers would have booked its customer representatives on commercial flights instead and would have made arrangements for ground transportation from other Dominican airports to Casa de Campo.

38.    Even with the additional costs involved for ground transportation from other Dominican airports to Casa de Campo, flying commercial would have resulted in a lower price than what Triumph Jets quoted in Quote 1686 and what Air Engineers eventually paid for round-trip travel between BHM and LRM.

39.    In other words, the reason that Air Engineers was interested in the more expensive chartered travel option provided by Triumph Jets was the convenience of being able to book direct, round-trip flights from Alabama or the Florida panhandle to an airport only 10 minutes away from Casa de Campo.

40.    Triumph Jets' price of $225,434.68 was listed on the face of the one-page Quote 1686 and on the "Annex" back-dated as of November 6, 2023 and attached to the "Air Charter Agreement" back-dated as of August 21, 2023.

41.    This "Annex" provided that the $225,434.68 could be paid in two equal installments: a "Deposit" of $112,717.34 was "Due on Signing," and the "Balance" of $112,717.34 was due on March 22, 2024.

42.    Air Engineers paid Triumph Jets the grand total of $225,434.68.

43.    This amount was paid in advance of the trip in two equal installments.

44.    Air Engineers paid Triumph Jets the first installment of $112,717.34 on or shortly after November 16, 2023.

45.    Air Engineers paid Triumph Jets the second installment of $112,717.34 on or about March 26, 2024.

46.    Triumph Jets accepted both of these payments.

47.    All told, representatives of 38 different Air Engineers customers who had qualified for the trip (based on sales metrics finalized in January 2024) accepted Air Engineers' invitation and traveled with Air Engineers' representatives to and from the Casa de Campo resort in April 2024.

48.    These 38 customers, combined, account for approximately $60 million in Air Engineers' annual revenues.

**<u>Facts Part 2:</u>**
**<u>The Terms of the Triumph Jets "Air Charter Agreement"</u>**

49.    Under the August 21, 2013 "Air Charter Agreement," Triumph Jets was to arrange for charter services from a "Direct Air Carrier."

50.     Under paragraph 3, the "Direct Air Carrier" was, among other things, "to provide and operate the Aircraft for the transportation of passengers and their accompanying baggage" and was to be responsible for, among other things, "complete maintenance, overhaul and repair of the aircraft" and "maintenance support if necessary."

51.     Under paragraph 4, the "Direct Air Carrier" was to "operate flights on the schedule (the 'Schedule') shown in the Annex, **provided** that the Direct Air Carrier[,] **using commercially reasonable efforts**, has been able to **obtain all necessary approvals**, clearances, permits or operating authorities ('Governmental Approvals') **prior to the Initial Departure Date** (set forth in the Annex)." (emphasis added).

52.     Paragraph 5.B. provides, in relevant part, that "Direct Air Carrier will **make every effort** to comply with contractual departure and arrival times stated in the Schedule, but the departure and arrive times are subject to aircraft routing, gate space, weather conditions, and other operational factors."  Further, "while the Direct Air Carrier shall **use commercially reasonable efforts** to carry the passengers and baggage in accordance with the Schedule, Direct Air Carrier shall not be liable for failure of a flight to depart or arrive according to any predetermined schedule or routing." (emphasis added).

53.     The "Air Charter Agreement" makes no reference whatsoever to the Montreal Convention.

54.     Instead, Paragraph 13 provides, in relevant part, that "This Agreement shall be governed by the laws of the State of Illinois."

## Facts Part 3:
## The Terms of Alleged Global X "Air Charter Services Agreement"

55.     On information and belief, Triumph Jets retained Global X as the "Direct Air Carrier," per the terms of its "Air Charter Agreement" with Air Engineers.

56.    Global X has represented in filings with this Court that it entered into an "Aircraft Charter Services Agreement" with Triumph Jets dated October 31, 2023.

57.    Air Engineers has no knowledge whether or not the "Aircraft Charter Services Agreement" that Global X has provided in this litigation is a complete and authentic copy of the underlying document.

58.    Air Engineers likewise has no knowledge whether or not the "Aircraft Charter Services Agreement" that Global X has provided in this litigation might have been rescinded, amended, and/or superseded, in whole or in part, by some other agreement between Triumph Jets and Global X.

59.    Nevertheless, as part of the "Annex" attached to "Aircraft Charter Services Agreement" that Global X has provided in this litigation, it appears that Global X represented to Triumph Jets that it could provide an Airbus A320 aircraft to fly round-trip between BHM and LRM on April 24, 2024 (out-going flight) and April 28, 2024 (return flight).

60.    According to this same "Annex," Global X estimated that the out-going flight would take 3 hours and 20 minutes, and the return trip was estimated to take 3 hours and 50 minutes.

61.    On information and belief, it would be not be possible to make the out-going flight in less than 4 hours if the flight were not a direct flight.

62.    Likewise, on information and belief, it would not be possible make the return flight in less than 4 hours if the flight hours were not a direct flight.

63.    In no event would it be possible to depart LRM, land at a US airport other than BHM, have all crew and passengers processed by Customs and Border Protection at this other US airport, and then depart from this other US airport and arrive in BHM in less than 4 hours.

64.     Thus, in providing the time estimates "Annex" attached to "Aircraft Charter Services Agreement" dated October 31, 2023, Global X was representing that it would be possible to fly direct, round-trip between BHM and LRM.

65.     Section 1.C. of this "Aircraft Charter Services Agreement" provides, in relevant part, "GlobalX will operate the flights on the schedule shown in the Annex, ('Schedule'), provided that GlobalX and/or Charterer [Triumph Jets], **using commercially reasonable efforts**, have been able to obtain all necessary approvals, clearances, permits, or operating authorities ('Governmental Approvals') **prior to the Initial Departure** (defined in the Annex)." (emphasis added).

66.      Section 2.D. provides, in relevant part, "while GlobalX shall **use commercially reasonable efforts to carry the passengers and baggage in accordance with the Schedule**, GlobalX shall not be liable for failure of a flight to depart or arrive according to any predetermined schedule or routing."

67.     Section 2.E. provides, in relevant part, "GlobalX shall be reasonable for, and Charterer [Triumph Jets] shall **use commercially reasonable efforts** to assist GlobalX in … (iii) **all CBP [Customs and Border Protection] requirements** …."

68.     The "Aircraft Charter Services Agreement" makes no reference whatsoever to the Montreal Convention.

69.     Instead, Section 7.C. provides, in relevant part, "This Agreement shall be governed by and construed and interpreted in accordance with the State of Florida, United States of America, without regard to its conflict of law principles."

### Facts Part 4:
### Global X's Business and Triumph Jets' Concealment of Same

70.     As set forth above, on information and belief, Triumph Jets had chosen the "Direct Air Carrier" under its "Air Charter Agreement" and entered into the "Aircraft Charter Services

Agreement" with Global X even before Triumph Jets had provided Quote 1686 dated November 13, 2023 to Air Engineers.

71.    Global X's business consists, in part, of providing aircraft for the US government's use in deporting foreign nationals to other countries.

72.    For example, in a recent news story regarding the transport of Venezuelan nationals from the US to El Salvador, NBC News reported: "A blue 'Global X' plane took off from Harlingen, Texas … landing at El Salvador International Airport about an hour after the judge's ruling…. El Salvador's President Nahib Bukele posted a video to X … that appeared to show several deportees being taken off a blue 'Global X' plane and brought into the custody of heavily armed Salvadoran authorities." https://www.nbcnews.com/politics/trump-administration/trump-administration-touts-deportations-alien-enemies-act-rcna196628 (last visited Mar. 27, 2025).

73.    On information and belief, because it is in the business of operating US government-funded deportation flights to other countries, Global X may not have much experience making arrangements with Customs and Border Protection for passengers to re-enter the US.

74.    As someone in the business of hiring charters, Triumph Jets, on information and belief, knew or should have known that Global X's business consists, in part, of providing aircraft for the US government to use in deporting foreign nationals to other countries.

75.    At no time, however, did Triumph Jets disclose to Air Engineers that it was arranging to fly Air Engineers' passengers to and from the Dominican Republic using a "Direct Air Carrier" who also carried passengers traveling against their will on US government-funded deportation flights.

76.    Instead, Quote 1686 bears the name "Triumph Jets / Big Game Air." The website for "Big Game Air" explains that "Big Game Air is a premier provider of luxury game day travel experiences for the ultimate sports fan."

77.    Custom travel to sports games is a very different proposition from deportation flights. There is no indication on Quote 1686 or any other document that Triumph Jets provided to Air Engineers that Triumph Jets would be sub-contracting with a carrier who operated US government-funded deportation flights.

78.    If Air Engineers had known that Triumph Jets planned to retain a "Direct Air Carrier" using aircraft also used for US government-funded deportation flights, Air Engineers would not have entered into "Air Charter Agreement" with Triumph Jets and would have booked its customer representatives on non-direct flights with commercial carriers instead.

79.    If Air Engineers had booked its customer representatives on non-direct flights with commercial carriers, Air Engineers would have paid less than $225,434.68 to get its customer representatives from Alabama and the Florida panhandle to the Dominican Republic and back.

## Facts Part 5:
### The "Absolute Shit Show" of Air Travel

80.    As set forth in the Annexes to both the Triumph Jets "Air Charter Agreement" and the Global X "Aircraft Charter Services Agreement," the Airbus A320 aircraft was supposed to depart BHM at 12:00 pm Local Time on Wednesday, April 24, 2024.

81.    However, a few days before the departure, Air Engineers was informed that Global X's fleet of jets had sustained maintenance issues and that Global X would need to delay the departure time on Wednesday, April 24, 2024 until 2:00 pm Local Time.

82.    With a 2:00 pm departure time from BHM, Global X anticipated that its plane would arrive at LRM around 6:00 pm Local Time (versus the 4:20 pm arrival time set forth in the

Annexes to both the Triumph Jets "Air Charter Agreement" and the Global X "Aircraft Charter Services Agreement").

83.     This meant that, only a few days before the trip, Air Engineers had to scramble to re-schedule a welcome reception/dinner it had previously scheduled at the Casa de Campo resort for 5:00 pm Local Time.

84.     As it turned out, however, Global X's Airbus A320 aircraft failed to arrive in Birmingham before even the re-scheduled 2:00 pm departure time on Wednesday, April 24, 2024.

85.     Global X has stated that that its plane's late arrival on April 24, 2024 at BHM was "due to ground operations at Northwest Arkansas National Airport."

86.     It was Global X—not Air Engineers—who decided to use an airplane originating from Northwest Arkansas National Airport.

87.     The late arrival of Global X's plane from Arkansas meant the actual departure time from BHM was actually closer to 3:30 pm Local Time.

88.     Further, the interior of the Global X plane that arrived that arrived in BHM on April 24, 2024 had a strange smell to it.

89.     On information and belief, the smell on the plane had to do with the aircraft having been used for US government-funded flights of unwilling passengers, who would have had every incentive to soil the plane in protest of their involuntary travel.

90.     After departing from BHM, the Global X flight did not arrive at LRM until approximately 7:20 pm Local Time.

91.     This late arrival meant that the welcome reception/dinner—which Air Engineers had already had to re-schedule once—ended up being a bust.

92.     Meanwhile, once Air Engineers' representatives and its customer representatives had arrived at the Casa de Campo resort, the news only got worse.

93.     Specifically, on Saturday, April 27, 2024—approximately 36 hours before the scheduled return flight to Birmingham—Air Engineers was informed, for the first time, that the return flight on April 28, 2024 would **not** be a direct flight because Customs and Border Protection agents would **not** be available at BHM to clear passengers through passport control and customs.

94.     According to Global X, on Thursday, April 25, 2024, Global X informed Triumph Jets of the unavailability of Customs and Border Protection agents at BHM to meet the return flight on Sunday, April 28, 2024.

95.     But, according to information that Triumph Jets obtained after the flights in question, Global X itself had **not** provided any notice to Customs and Border Protection about the flight from LRM to BHM until approximately nine days before the trip.

96.     BHM's "port director" informed Triumph Jets, after the flights in the question, that "standard lead time" for notice of incoming international flights is typically 30 days in advance.

97.     In the words of Triumph Jets, the issues surrounding arrangements for Customs and Border Protection agents to meet the return flight at BHM on Sunday, April 28, 2024 "could have been flushed out way earlier."

98.     However, for reasons currently unknown, even when Global X reportedly informed Triumph Jets, on Thursday, April 25, 2024, of the problems encountered in making arrangements with Customs and Border Protection at BHM, Triumph Jets failed to relay this information to Air Engineers until approximately two days later.

99.     This meant that Air Engineers and its customer representatives did not learn about the change in plans until Saturday, April 27, 2024.

100.    When Air Engineers was informed, on Saturday, April 27, 2024, that the return flight the next day would have to stop at another US airport to clear customs before continuing on to Birmingham, Air Engineers was initially offered a choice of three airports: (1) Miami International Airport; (2) Orlando International Airport; or (3) Jacksonville International Airport.

101.    Air Engineers expressed a preference for either Orlando or Jacksonville, only to then be told that paperwork had **not** been submitted in time to arrange for Customs and Border Protection agents to meet the aircraft in either Orlando or Jacksonville.

102.    Air Engineers' representatives spent much of the day on Saturday, April 27, 2024 working to coordinate the travel arrangements for the next day, rather than spending time with customer representatives, which, after all, had been the original purpose of the four-night trip to the Casa de Campo resort.

103.    At the farewell dinner held on Saturday, April 27, 2024, Air Engineers had to inform its customer representatives that the return flight the next day would **not** be a direct flight back to Birmingham and that passengers would, **instead**, have to de-plane in Miami in order to clear passport control and customs.

104.    This news was, needless to say, **not** well received by the customer representatives, many of whom would have to drive several hours after deplaning at BHM in order to return to homes elsewhere in Alabama or in the Florida panhandle.

105.    As set forth in the Annexes to both the Triumph Jets "Air Charter Agreement" and the Global X "Aircraft Charter Services Agreement," the Airbus A320 aircraft was supposed to depart LRM at 2:00 pm Local Time on Sunday, April 24, 2024.

106.    However, Global X has now acknowledged that the airplane it had planned to use to complete the April 28, 2024 flight(s) was "declared 'Aircraft on Ground' due to maintenance concerns."

107.    This required Global X to locate a "replacement aircraft," and Global X eventually provided Air Engineers with a new departure time of 3:30 pm on April 28, 2024.

108.    The plane attempted to depart LRM closer to 4:00 pm Local Time, but the plane aborted its take-off on the runway.

109.    Specifically, after accelerating for take-off, the pilot performed an emergency stop on the runway before taxiing the plane back to the terminal.

110.    The emergency stop caused significant distress among the passengers on the plane.

111.    Global X explained, at the time, that the take-off had to be aborted because the aircraft's wind-shear sensor had gone off.

112.    Obviously, no plane should be taking off in the presence of wind shear, but after an additional two hours on the ground at LRM, it was determined that there had been no wind shear.

113.    Rather, the aircraft's wind-shear sensor had given off a false alarm.

114.    It is not clear whether the aircraft's wind-shear sensor was actually repaired during this additional two-hour wait on the ground or whether, instead, the two-hours was used merely to determine that the wind-shear sensor was, in fact, giving off false alarms.

115.    If the latter, this would mean that Global X then flew the aircraft without a working wind-shear sensor and exposed the passengers to unnecessary risks.

116.    Providing additional distress to the passengers (Air Engineers' customer representatives), the passengers had legitimate reason to believe that the sensor had not been fixed,

because a Global X maintenance employee joined the crew in the cockpit of the plane following the aborted take-off and stayed on the plane throughout the first leg of the flight to Miami.

117.    After the aborted take-off and the two-hour wait for work on the wind-shear sensor, the Global X aircraft finally departed LRM for Miami at approximately 6:00 pm Local Time.

118.    After landing in Miami, it took passengers another two hours on the ground to go through passport control, retrieve checked bags, go through customs, exit the terminal, and then check back in for the next leg of the flight back to Birmingham.

119.    The Global X flight did not arrive at BHM until approximately 12:30 am Local Time on Monday, April 29, 2024—this was almost **eight hours later** than the 4:50 pm Local Time arrival time set forth in the Annexes to both the Triumph Jets "Air Charter Agreement" and the Global X "Aircraft Charter Services Agreement."

120.    After arriving at BHM in the early morning hours of Monday, April 29, 2024, Global X apparently failed to communicate with ground personnel at BHM, because the lights in airport terminal went off while passengers were waiting for their bags to arrive on the baggage carousel.

121.    It took approximately 45 minutes to get the lights in the terminal turned back on and to collect checked bags.

122.    Given that it was after 1:00 am on Monday, April 29, 2024 by the time Air Engineers' customer representatives got their checked bags, Air Engineers then paid for hotel rooms for any passengers who requested it—after all, some customer representative were facing drives of more than four hours to return to homes elsewhere in Alabama or in the Florida panhandle.

123.    Meanwhile, during the day on Sunday, April 28, 2024, when Air Engineers reported the problems that they were encountering with the return flights, Arturo Gomez at Triumph Jets responded to Air Engineers by describing what was going as an "absolute shit show."

## CAUSES OF ACTION

### COUNT ONE – Claims Under Article 19 of the Montreal Convention
### (Against Triumph Jets and Global X)

124.    Air Engineers re-alleges and incorporates by reference paragraphs 1 through 123 above.

125.    As of the hearing in this case on March 5, 2025, both Triumph Jets and Global X had conceded that some or all of their conduct at issue in this litigation is governed by the Montreal Convention.

126.    Triumph Jets meets the definition in Article 39 of the Convention for a "Contracting Carrier."

127.    Global X meets the definition in Article 39 of the Convention for an "Actual Carrier."

128.    Article 40 of the Convention provides, in relevant part, that "both the contracting carrier and the actual carrier shall … be subject to the rules of this Convention, the former for the whole of carriage contemplated in the contract, the latter solely for the carriage which it performs."

129.    Article 41, paragraph 1, of the Convention provides, "The acts and omission of the actual carrier and its servants and agents acting within the scope of their employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the contracting carrier."

130.    Article 41, paragraph 2, of the Convention provides, in relevant part, "The acts and omission of the contracting carrier and its servants and agents acting within the scope of their

employment shall, in relation to the carriage performed by the actual carrier, be deemed to be also those of the actual carrier."

131.    Therefore, under the Convention, Triumph Jets and Global are jointly and severally liable for each other's acts and omissions in relation to the carriage performed by Global X for Air Engineers' passengers.

132.    Critically, Article 19 of the Montreal Convention provides:

The carrier is liable for damage occasioned **by delay** in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took **all measures that could reasonably be required** to avoid the damage or if it was impossible for it or them to take such measures.

(emphasis added)

133.    Here, Air Engineers' passengers experienced delays, both on the out-going flight and on the return flights. Perhaps most noticeable of the delays here were the delays occasioned by the stop at Miami International Airport on April 28, 2024, when Air Engineers' passengers had to be cleared by Customs and Border Protection agents in Miami, instead of at BHM.

134.    Triumph Jets failed to take all measures that could reasonably be required to avoid the delays caused by the stop at Miami International Airport on April 28, 2024, when Air Engineers' passengers had to be cleared by Customs and Border Protection agents in Miami, instead of at BHM.

135.    Global X failed to take all measures that could reasonably be required to avoid the delay caused by the stop at Miami International Airport on April 28, 2024, when Air Engineers' passengers had to be cleared by Customs and Border Protection agents in Miami, instead of at BHM.

136.    Although the failure to make advance arrangements for Customs and Border Protection agents to meet the return flight at BHM on Sunday, April 28, 2024 is arguably the most

egregious example of Defendants' failures to take all measures that could reasonably be required to avoid delays, it is by no means the only example.

137.    On information and belief, Defendants failed to take all measures that could reasonably be required to have an Airbus A320 aircraft at  BHM before the originally scheduled 12:00 pm Local Time departure on Wednesday, April 24, 2024.

138.    On information and belief, Defendants failed to take all measures that could reasonably be required to have an Airbus A320 aircraft at  BHM before the re-scheduled 2:00 pm am Local Time departure on Wednesday, April 24, 2024.

139.    Defendants failed to take all measures that could reasonably be required to provide notice of an international flight arriving at BHM within the "standard lead time" (typically 30 days before the flight).

140.    Upon learning that Customs and Border Protection agents would not be available to meet the return flight at BHM on Sunday, April 28, 2024, Defendants failed to take all measures that could reasonably be required to contact Customs and Border Protection such that Air Engineers' passengers on the return flight could clear passport control and customs at either the Orlando International Airport or the Jacksonville International Airport;

141.    On information and belief, Defendants failed to take all measures that could reasonably be required to maintain the original aircraft declared "Aircraft on Ground," rendering this aircraft unable to carry out the scheduled April 28, 2024 flight from LRM to BHM.

142.    On information and belief, Defendants failed to take all measures that could reasonably be required to have an Airbus A320 aircraft at LRM before the originally scheduled 2:00 pm Local Time departure on Sunday, April 28, 2024.

143.    On information and belief, Defendants failed to take all measures that could reasonably be required to maintain the substitute aircraft that had to abort a take-off at LRM on Sunday, April 28, 2024 because the airplane's sensor was reporting wind shear during take-off.

144.    On information and belief, Defendants failed to take all measures that could reasonably be required to make arrangements with ground personnel at BHM in the early morning hours of Monday, April 29, 2024, thus permitting the terminal lights to go out while Air Engineers' passengers were still waiting for their bags on the baggage carousel and causing additional delays so that the lights could be turned back on.

145.    As a result of these delays, Air Engineers has suffered damages.

146.    For example, if Air Engineers had known that Global X would not be able to provide a plane able to depart BHM at 12:00 pm Local Time on April 24, 2024 or even in time to depart BHM at 2:00 pm Local Time on April 24, 2024, Air Engineers would not have arranged and paid for the welcome reception/dinner at Caso de Campo on April 24, 2024.

147.    If Air Engineers had known that it would not be possible to fly direct from LRM to BHM for the return flight on April 28, 2024, Air Engineers would not have paid nearly a quarter of million dollars for charter flights and instead would have purchased commercial airline tickets for its customers representatives to fly round-trip from Alabama and the Florida panhandle to the Dominican Republic.

148.    Because of the delays on the return flights on April 28-29, 2024, Air Engineers also ended up purchasing hotel rooms in the early morning hours of Monday, April 29, 2024, for those customer representatives who requested it. After all, some customer representative were facing drives of more than four hours to return to homes elsewhere in Alabama or in the Florida

panhandle, and it was after 1:00 am on Monday, April 29, 2024 when Air Engineers' passengers finally were able to retrieve their checked bags at BHM.

149.   After Air Engineers' customer representatives experienced what Triumph Jets has described as an "absolute shit show," some of these customers, on information and belief, may think less of Air Engineers.

150.   Ever since April 29, 2024, the volume of Air Engineers' orders from some customers whose representatives were on the BHM-LRM round-trip flights has gone down.

151.   Air Engineers believes that this decline in customer orders may be due to the bad experiences the customers had on the BHM-LRM round-trip flights and believes that some customers may now be taking their business to Air Engineers' competitors, instead of to Air Engineers.

152.   Further, the trips that Air Engineers provides its customer representatives are announced well in advance, since customers have to meet certain sales metrics in order for their principals and/or managers to participate in the trip.

153.   Because the 2024 trip ended up being, in Triumph Jets' words, an "absolute shit show," Air Engineers' customers may now have less incentive to meet the sales metrics that Air Engineers sets for participation in future trips.

154.   Under Article 22, paragraph 1, of the Montreal Convention, Air Engineers seeks damages of up to 5,347 Special Drawing Rights (or any other higher number allowed) for each passenger on the flights that Air Engineers paid for under the "Air Charter Agreement" with Triumph Jets.

155.   Under Article 22, paragraph 6, of the Montreal Convention, Air Engineers seeks court costs and other expenses of litigation, including interest.

**WHEREFORE**, Plaintiff, Air Engineers, demands judgment against Triumph Jets and Global X, jointly and severally, for the full amount of money damages recoverable under the Montreal Convention based on the number of passengers Air Engineers paid for on each of the flights, together with interest and costs of this action, and all such further relief which it may be entitled or as this Court may deem appropriate.

### COUNT TWO – Breach of Contract
### (Against Triumph Jets)

156.    Air Engineers re-alleges and incorporates by reference paragraphs 1 through 123 above.

157.    Under Article 25 of the Montreal Convention, "A carrier may stipulate that the contract of carriage shall be subject to **higher limits of liability than those provided for in this Convention** or to no limits of liability whatsoever." (emphasis added).

158.    In contrast, under Article 26, "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void …."

159.    Read together, Articles 25 and 26 mean that the Montreal Convention sets a floor, not a ceiling, for liability arising from international air travel.

160.    Here, the "Air Charter Agreement" between Air Engineers and Triumph Jets provides for application of Illinois law and makes no reference to the Montreal Convention.

161.    Therefore, Air Engineers seeks additional recovery that may be available under Illinois law, above and beyond the limits on damages imposed by the Montreal Convention.

162.    In its court filings in this litigation, Triumph Jets has conceded that the "Air Charter Agreement" created a contractual relationship between Air Engineers and Triumph Jets.

163.    Here, Air Engineers paid Triumph Jets the total amount of $225,434.68 set forth in Quote 1686 and in the "Annex" to the "Air Charter Agreement" and thus assented to certain terms in the back-dated August 21, 2023 "Air Charter Agreement."

164.    Air Engineers fulfilled its obligations to Triumph Jets under the "Air Charter Agreement" by paying Triumph Jets the total amount of $225,434.68 set forth in Quote 1686 and in the "Annex" to the "Air Charter Agreement."

165.    Triumph Jets breached its contractual duties to Air Engineers by retaining a "Direct Air Carrier" who, among other things:

- failed to use commercially reasonable efforts to have an Airbus A320 aircraft at BHM before the originally scheduled 12:00 pm Local Time departure on Wednesday, April 24, 2024;

- failed to use commercially reasonable efforts to have an Airbus A320 aircraft at BHM before the re-scheduled 2:00 pm am Local Time departure on Wednesday, April 24, 2024;

- failed to provide notice of an international flight arriving at BHM within the "standard lead time" (typically 30 days before the flight);

- failed to make arrangements with Customs and Border Protection agents at BHM so as to allow for a direct flight from LRM to BHM;

- upon learning that Customs and Border Protection would not be available to meet the return flight at BHM, failed to use commercially reasonable efforts to contact Customs and Border Protection such that passengers on the return flight could clear passport control and customs at either the Orlando International Airport or the Jacksonville International Airport;

- failed to maintain the original aircraft declared "Aircraft on Ground," rendering this aircraft unable to carry out the scheduled April 28, 2024 flight from LRM to BHM;

- failed to use commercially reasonable efforts to have an Airbus A320 aircraft at the LRM before the originally scheduled 2:00 pm Local Time departure on Sunday, April 28, 2024;

- failed to maintain the substitute aircraft that had to abort a take-off at LRM on Sunday, April 28, 2024 because the airplane's sensor was reporting wind shear during take-off;

- possibly failed to repair the wind-shear sensor after the aborted take-off at LRM on Sunday, April 28, 2024 and thereby permitted the pilot to fly the aircraft without an operational wind-shear sensor; and

- failed to make arrangements with ground personnel at BHM in the early morning hours of Monday, April 29, 2024 and permitted the terminal lights to go out while passengers were still waiting for their bags on the baggage carousel.

166.    Further, assuming that Global X is telling the truth when it said that, on Thursday, April 25, 2024, it informed Triumph Jets of the unavailability of Customs and Border Protection agents at BHM, then Triumph Jets also breached its contractual obligations to Air Engineers by waiting until Saturday, April 27, 2024 to relay this information to Air Engineers.

167.    Air Engineers has suffered damages and is continuing to suffer damages because of Triumph Jets' breaches of contract.

WHEREFORE Plaintiff, Air Engineers, demands judgment against Triumph Jets for money damages, together with interest and costs of this action and all such further relief which it may be entitled or as this Court may deem appropriate.

<u>**COUNT THREE – Fraudulent Inducement and Suppression Based**</u>
<u>**on the Apparent Unavailability of Direct Return Flights**</u>
<u>**(Against Triumph Jets)**</u>

168.    Air Engineers re-alleges and incorporates by reference paragraphs 1 through 123 above.

169.    This Count is being brought in the alternative to Count Two above.

170.    Under Article 25 of the Montreal Convention, "A carrier may stipulate that the contract of carriage shall be subject to **higher limits of liability than those provided for in this Convention** or to no limits of liability whatsoever." (emphasis added).

171.    In contrast, under Article 26, "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void …."

172.    Read together, Articles 25 and 26 mean that the Montreal Convention sets a floor, not a ceiling, for liability arising from international air travel.

173.    Here, the "Air Charter Agreement" between Air Engineers and Triumph Jets provides for application of Illinois law and makes no reference to the Montreal Convention.

174.    Therefore, Air Engineers seeks additional recovery that may be available under Illinois law, above and beyond the limits on damages imposed by the Montreal Convention.

175.    Here, Air Engineers only entered into the "Air Charter Agreement" and paid Triumph Jets the total amount of $225,434.68 because of representations made by Triumph Jets in Quote 1686—this includes the representation that it would be possible to fly direct from LRM to BHM on Sunday, April 28, 2024.

176.    At the time Triumph Jets provided Quote 1686 to Air Engineers on or about November 13, 2023, Triumph Jets knew or should have known that Customs and Border Protection agents at BHM typically only worked Monday through Friday and that arrangements would need

to be made in order for Customs and Border Protection agents to meet an international flight arriving on a Sunday.

177.    As one in the business of arranging air charters, Triumph Jets was in a position of superior knowledge and had a duty to disclose to Air Engineers what it knew about the need to confirm whether or not Customs and Border Protection agents would even be available to meet an international flight arriving at BHM on a Sunday.

178.    As worded, Quote 1686 was misleading because Quote 1686 represented that it would be possible to fly direct from LRM to BHM on a Sunday.

179.    Further, Quote 1686 was misleading because it made no reference whatsoever to the need to make arrangements with Customs and Border Protection agents at BHM to meet an international flight arriving on a Sunday.

180.    Triumph Jets knew or should have known that Air Engineers would rely on Triumph Jets' representation that it would be possible to fly direct from LRM to BHM on a Sunday.

181.    Air Engineers did, in fact, rely on Triumph Jets' representations here and also relied on Triumph Jets' silence about the need to make arrangements with Customs and Border Protection agents at BHM to meet an international flight arriving on a Sunday.

182.    If Triumph Jets had not represented to Air Engineers that it would be possible to fly direct from LRM to BHM on a Sunday, Air Engineers would have booked its customer representatives on commercial flights.

183.    Alternatively, if Triumph Jets had disclosed, in Quote 1686, the need to make arrangements with Customs and Border Protection agents at BHM to meet an international flight arriving on a Sunday, Air Engineers would have undertaken efforts, before paying $225,434.68

and in advance of the actual air travel, to confirm that those arrangements were, in fact, being made.

184.    Air Engineers has suffered damages and is continuing to suffer damages because of Triumph Jets' acts of fraudulent inducement and suppression.

WHEREFORE Plaintiff, Air Engineers, demands judgment against Triumph Jets for compensatory and punitive damages, together with interest and costs of this action, attorneys' fees, and all such further relief which it may be entitled or as this Court may deem appropriate.

<u>**COUNT FOUR – Fraudulent Inducement and Suppression Based**</u>
<u>**on Triumph Jets' Superior Knowledge and Concealment of Global X's Business**</u>
<u>**(Against Triumph Jets)**</u>

185.    Air Engineers re-alleges and incorporates by reference paragraphs 1 through 123 above.

186.    Because this Count Four does not seek recovery for damages for death or injury of passengers, does not seek recovery for damage to checked baggage, does not seek recovery for damage to cargo, and does not seek recovery for damage caused by delay, this Count Four is not subject to the Montreal Convention.

187.    At and before the time that Triumph Jets entered into its "Air Charter Agreement" with Air Engineers, Triumph Jets knew or should have known that Global X's business consists, in part, of providing aircraft for the US government to use in deporting foreign nationals to other countries.

188.    This is a material fact that Triumph Jets, by virtue of its business, had a duty to disclose to prospective customers such as Air Engineers.

189.    The business of providing aircraft for the US government to use in deporting foreign nationals to other countries is very different, for example, from the business of providing "luxury game day travel experiences for the ultimate sports fan."

190.    Deportees are often unwilling passengers, and the carrier therefore does not depend on passenger satisfaction in order to obtain repeat business.

191.    In contrast, in other types of private charter flights—such as "luxury game day travel experiences for the ultimate sports fan"—passenger satisfaction can be key to obtaining repeat business.

192.    On information and belief, because Global X was in the business of providing aircraft for the US government to use in deporting foreign nationals to other countries, passenger satisfaction and the overall passenger experience may not have been high priorities for Global X's flight crews.

193.    On information and belief, the overall poor experience that Air Engineers' passengers had on the roundtrip travel between BHM and LRM may have resulted from Global X's relative inexperience in catering to passengers flying by choice, rather than to passengers who were unwilling passengers on deportation flights paid for by the US government.

194.    At no time before the travel on April 24, 2024 and April 28-29, 2024 did Triumph Jets ever disclose to Air Engineers that Global X's business consists, in part, of providing aircraft for the US government to use in deporting foreign nationals to other countries.

195.    At no time before the travel on April 24, 2024 and April 28-29, 2024 did Triumph Jets ever disclose to Air Engineers that the aircraft Global X was supplying to Air Engineers and its passengers may have also been used for US government-funded deportation flights.

196.    Had Air Engineers known about Global X's business, known that Triumph Jets was going to use Global X as its "Direct Air Carrier" under the "Air Charter Agreement," and known that Global X could supply aircraft recently used for US government-funded deportation flights, Air Engineers would not have entered into the "Air Charter Agreement" with Triumph Jets.

197.    Instead, Air Engineers would have made other arrangements to get its customers representatives to and from the Dominican Republic, such as by purchasing commercial airline tickets for its customer representatives to fly round-trip from Alabama and the Florida panhandle to the Dominican Republic.

198.    As it was, though, Air Engineers relied on Triumph Jets' silence and paid Triumph Jets the total amount of $225,434.68 for round-trip air.

199.    Air Engineers' passengers had a poor overall experience as a result of the flights operated on April 24 and April 28-29, 2024 by Global X.

200.    On information and belief, as a result of these poor experiences, Air Engineers has been damaged by loss of business from its customers.

201.    After Air Engineers' customer representatives experienced what Triumph Jets has described as an "absolute shit show," some of these customers, on information and belief, may think less of Air Engineers.

202.    Ever since April 29, 2024, the volume of Air Engineers' orders from some customers whose representatives were on the BHM-LRM round-trip flights has gone down.

203.    Air Engineers believes that this decline in customer orders may be due to the bad experiences the customers had on the BHM-LRM round-trip flights and believes that some customers may now be taking their business to Air Engineers' competitors, instead of to Air Engineers.

204.    Further, the trips that Air Engineers provides its customer representatives are announced well in advance, since customers have to meet certain sales metrics in order for their principals and/or managers to participate in the trip.

205.    Because the 2024 trip ended up being, in Triumph Jets' words, an "absolute shit show," Air Engineers' customers may now have less incentive to meet the sales metrics that Air Engineers sets for participation in future trips.

WHEREFORE Plaintiff, Air Engineers, demands judgment against Triumph Jets for compensatory and punitive damages, together with interest and costs of this action, attorneys' fees, and all such further relief which it may be entitled or as this Court may deem appropriate.

### COUNT FIVE – Third-Party Beneficiary Claims
### (Against Global X)

206.    Air Engineers re-alleges and incorporates by reference paragraphs 1 through 123 above.

207.    Under Article 25 of the Montreal Convention, "A carrier may stipulate that the contract of carriage shall be subject to **higher limits of liability than those provided for in this Convention** or to no limits of liability whatsoever." (emphasis added).

208.    In contrast, under Article 26, "Any provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this Convention shall be null and void …."

209.    Read together, Articles 25 and 26 mean that the Montreal Convention sets a floor, not a ceiling, for liability arising from international air travel.

210.    Here, the "Aircraft Charter Services Agreement" between Triumph Jets and Global X provides for application of Florida law and makes no reference to the Montreal Convention.

211.    Therefore, Air Engineers seeks additional recovery that may be available under Florida law, above and beyond the limits on damages imposed by the Montreal Convention.

212.    In its court filings in this litigation, Triumph Jets has conceded that the "Aircraft Charter Services Agreement" it produced created a contractual relationship between Triumph Jets and Global X.

213.    Triumph Jets and Global X entered into a contractual relationship, whether or not this relationship is governed by the "Aircraft Charter Services Agreement" Global X produced in this litigation or by some other document.

214.    As part of this contractual relationship, Global X agreed to provide airplanes and crew for Air Engineers and its passengers on April 24, 2024 (the out-going flight from Birmingham, Alabama, USA to La Romana, Dominican Republic) and on April 28, 2024 (the return flight from La Romana, Dominican Republic to Birmingham, Alabama, USA).

215.    Air Engineers and the customer representatives it had invited to the Casa de Campo resort in the Dominican Republic were intended third-party beneficiaries of any and all relevant contracts between Triumph Jets and Global X.

216.    The "Aircraft Charter Services Agreement" that Global X has produced in this litigation would be incoherent if Air Engineers and its passengers were not third-party beneficiaries of this agreement.

217.    The "Aircraft Charter Services Agreement" that Global X has produced in this litigation would fail of essential purpose if Air Engineers and its passengers were not third-party beneficiaries of this agreement.

218.    Under the "Aircraft Charter Services Agreement" that Global X has produced in this litigation, Global X did not provide any air travel to anyone affiliated with Triumph Jets.

219.    Air Engineers paid Triumph Jets almost a quarter of a million dollars for a direct, round-trip charter flight between Birmingham, Alabama, USA and La Romana in the Dominican Republic.

220.    On information and belief, after receiving payment from Air Engineers, Triumph Jets then performed its end of the bargain with Global X by paying Global X for the services it provided under contract with Triumph Jets.

221.    Global X breached its contractual duties to Triumph Jets under the contract and to Air Engineers as a third-party beneficiary under the contract in numerous ways, including, but not limited to, the following:

- failing to use commercially reasonable efforts to have an Airbus A320 aircraft at BHM before the originally scheduled 12:00 pm Local Time departure on Wednesday, April 24, 2024;

- failing to use commercially reasonable efforts to have an Airbus A320 aircraft at BHM before the re-scheduled 2:00 pm am Local Time departure on Wednesday, April 24, 2024;

- failing to provide notice of an international flight arriving at BHM within the "standard lead time" (typically 30 days before the flight);

- failing to make arrangements with Customs and Border Protection agents at BHM so as to allow for a direct flight from LRM to BHM;

- upon learning that Customs and Border Protection would not be available to meet the return flight at BHM, failing to use commercially reasonable efforts to contact Customs and Border Protection such that passengers on the return flight could clear

passport control and customs at either the Orlando International Airport or the Jacksonville International Airport;

- failing to maintain the original aircraft declared "Aircraft on Ground," rendering this aircraft unable to carry out the scheduled April 28, 2024 flight from LRM to BHM;

- failing to use commercially reasonable efforts to have an Airbus A320 aircraft at LRM before the originally scheduled 2:00 pm Local Time departure on Sunday, April 28, 2024;

- failing to maintain the substitute aircraft that had to abort a take-off at LRM on Sunday, April 28, 2024 because the airplane's sensor was reporting wind shear during take-off;

- possibly failing to repair the wind-shear sensor after the aborted take-off at LRM on Sunday, April 28, 2024 and thereby permitting the pilot to fly the aircraft without an operational wind-shear sensor; and

- failing to make arrangements with ground personnel at BHM in the early morning hours of Monday, April 29, 2024 and permitting the terminal lights to go out while passengers were still waiting for their bags on the baggage carousel.

222.    Air Engineers has suffered damages and is continuing to suffer damages because of Global X's breaches of its contractual obligations owed to Air Engineers as a third-party beneficiary of the contract between Triumph Jets and Global X.

**WHEREFORE** Plaintiff, Air Engineers, demands judgment against Global X for money damages, together with interest and costs of this action, and all such further relief which it may be entitled or as this Court may deem appropriate.

## **JURY DEMAND**

Plaintiff demands trial by struck jury on all claims so triable.

Respectfully submitted,

*/s/ Devin C. Dolive*
D. Matthew Centeno (CEN006)
Devin C. Dolive (DOL006)
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, AL 35203
Telephone:  (205) 458-5378
Facsimile:  (205) 458-5100
mcenteno@burr.com
ddolive@burr.com

Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have, on March 28, 2025, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Todd David Engelhardt
Kaitlin Renee Parham
ADAMS AND REESE, LLP
1901 6th Avenue North, Ste. 1110
Suite 1110
Birmingham, AL 35203
205-250-5000
Fax: 205-250-5034
Email: todd.engelhardt@arlaw.com
        kaitlin.parham@arlaw.com

Benjamin J. Widlanski
Clayton J. Schmitt
KOZYAK, TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Boulevard, Floor 9
Miami, FL 33134
305-372-1800
Email: bwidlanski@kttlaw.com
        cschmitt@kttlaw.com

John Mark White
William Chambers Waller, IV
WHITE ARNOLD & DOWD, PC
2001 Park Place, Ste. 1400
Birmingham, AL 35203
205-323-1888
Fax: 205-323-8907
Email: mwhite@whitearnolddowd.com
        cwaller@whitearnolddowd.com

_/s/ Devin C. Dolive_____
OF COUNSEL