FILED

2025 May-06  PM 12:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| AIR ENGINEERS, LLC | |
| Plaintiff, | |
| v. | Case No. 2:24-cv-01461-NAD |
| TRIUMPH JETS LLC AND GLOBAL CROSSING AIRLINES, INC., | OPPOSED |
| Defendants. | |

## TRIUMPH JETS LLC'S AMENDED[1] MOTION TO DISMISS AMENDED COMPLAINT

Defendant, TRIUMPH JETS LLC, ("Triumph"), by and through its undersigned counsel, and pursuant to Federal Rule of Civil Procedure 12(b)(6), requests this Court dismiss Plaintiff AIR ENGINEERS, LLC's ("Air Engineers") Amended Complaint ("Amended Complaint")(Doc. 43) against Triumph with prejudice. In support of this motion, Triumph states as follows:

### Procedural Background and Request for Relief

1.      On September 13, 2024, Air Engineers filed its Complaint against Triumph and co-Defendant Global Crossing Airlines, Inc. ("Global X" or "Direct Air Carrier") in state court. (Doc. 1-1 pp. 3-31)

2.      The Complaint was served on Triumph on September 27, 2024. (Doc 1-1 p. 35).

3.      Triumph timely filed its Notice of Removal (Doc. 1) on October 28, 2024, removing the litigation to this Court because the parties are diverse in citizenship and the amount in controversy exceeds $75,000.00.

---

[1] Triumph files this Amended Motion to comply with the page limitations in the Court's Initial Order (Doc. 27) and withdraws its previously-filed Motion to Dismiss (Doc. 48). Air Engineers has consented to this Amendment, and Triumph consents to any extensions in the briefing schedule to respond to same.

4.      Triumph filed its Motion to Dismiss Complaint (Doc. 3) on November 4, 2024.

5.      The Court granted Triumph's Motion to Dismiss (Doc. 41) on March 5, 2025. The Court gave Air Engineers until March 28, 2025 to file an Amended Complaint. (*Id.*).

6.      On March 28, 2025, Air Engineers filed its Amended Complaint (Doc. 43). The 222 allegations in the Amended Complaint are similar to those in Air Engineers' original Complaint. The allegations stem from two private jet flights Air Engineers chartered through Triumph – and flown by Global X – between Birmingham and the Dominican Republic. Air Engineers seeks to recover damages because each of the flights departed and arrived a few hours later than originally scheduled, and because the return flight stopped in Miami so that the passengers could be checked by United States Customs and Border Patrol agents.

7.      Air Engineers brings claims against Triumph for claims under Article 19 of the Montreal Convention (Count One), breach of contract (Count Two), fraudulent inducement and suppression based on the apparent unavailability of direct return flights (Count Three), and fraudulent inducement and suppression based on Triumph Jet's alleged knowledge and concealment of Global X's business activities (Count Four).

8.      Air Engineers fails to state any claim for which relief can be granted against Triumph in accordance with Federal Rule of Civil Procedure 12(b)(6).

9.      Air Engineers' Montreal Convention claim fails because Air Engineers does not have standing to bring the claims on behalf of the passengers on the flight.

10.     Air Engineers' breach of contract claim fails because the Montreal Convention preempts state law actions. Even assuming the Montreal Convention did not supersede and prevent state law actions, Triumph fulfilled each of its contractual obligations to Air Engineers. Additionally, the terms of the contract waived Air Engineers' claims against Triumph.

11.    Air Engineers' fraudulent inducement and suppression claim based on the apparent unavailability of direct return flights fails because any representations made prior to the execution of the contract between the parties were nullified by the merger clause contained within the contract, binding Air Engineers and Triumph only to the express terms of the contract.[2] Under Alabama law, a party's reliance on any misrepresentation must be reasonable, and a sophisticated plaintiff like Air Engineers is presumed to have read the contract with terms that might contradict any statements relied upon.

12.    Air Engineers' second fraudulent inducement and suppression claim based on whether Global X conducts other types of flights fails because there is no allegation that Triumph Jets had any knowledge that Global X's other business activities were relevant to Air Engineers' choice to charter flights to the Dominican Republic, nor to the ability of Global X to provide contracted-for services. As such, Triumph did not suppress any "material fact" and had no duty to disclose Global X's alleged outside business ventures.

WHEREFORE, for the reasons set forth above and below, Triumph respectfully requests this Court grant the Motion and dismiss Air Engineers' claims against Triumph in the Amended Complaint with prejudice for failure to satisfy the pleading requirements of Fed. R. Civ. P. 12(b)(6).

---

[2]    Air Engineers did not attach a copy of the contract at issue to the Amended Complaint, but it is attached to this motion and properly considered at this stage. *See Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015).

## ARGUMENT

**I. Air Engineers' claims against Triumph must be dismissed under Fed. R. Civ. P. 12(b)(6) because Air Engineers fails to state any claims against Triumph upon which relief may be granted.**

Each of Air Engineers' claims against Triumph fails to meet the requirements that Air Engineers show it is legally entitled to relief. Throughout its Amended Complaint, Air Engineers admits facts that negate the very claims it attempts to plead, and the explicit language within the contract between the parties prevents the exact claims Air Engineers has tried to raise.

The standard of review on this motion is well known to the Court. To survive a defendant's 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 570 (2007)). Here, the Court does not have to take as true Air Engineers' legal conclusions or allegations made "upon information and belief." *Mann v. Palmer*, 713 F. 3d 1306, 1315 (11th Cir. 2013) (citing *Twombly*, 550 U.S. at 551-557). The Eleventh Circuit uses a two-pronged approach to assess the sufficiency of a plaintiff's pleading. First, the Court should "eliminate any allegations in the complaint that are merely legal conclusions." *Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010). Next, the Court should "assume the veracity" of any well-pleaded factual allegations, and "then determine whether they plausibly give rise to an entitlement to relief." *Id.* Accordingly, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558. Such deficiencies abound here.

    A.    *Air Engineers does not have standing to bring this action under the Montreal Convention.*

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." *Jacobson v. Florida Secretary of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting U.S. Const. art. III, § 2.) "To have a case or controversy, a litigant must establish that he has standing," which requires proof of three elements. *Id*. (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019)). The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Id*. (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Importantly, beyond the Constitutional principles of standing are prudential ones. As relevant here, in order to bring suit in federal court "the plaintiff generally must assert *his own* legal rights and interests, and *cannot* rest his claim to relief on the legal rights or interests of *third parties*." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing cases)(emphasis added).

Air Engineers cannot prove that it suffered an "injury" under the Montreal Convention at all. Article 19 of the Montreal Convention states that a "carrier is liable for damage occasioned by delay," and Article 22(1) states that "the liability of the carrier *for each passenger* is limited to 4[,]150 Special Drawing Rights." Montreal Convention arts. 19, 22(1)(emphasis added).[3] The text of the Montreal Convention is clear that recovery is limited to actual damages incurred by or "for each passenger." *Id*. arts. 22(1), 39; *Click 2 Refund Inc. v. Brit. Airways PLC*, No. 19-CV-05399, 2019 WL 6135123, at *5 (C.D. Cal. Nov. 18, 2019) (finding that passengers must sustain economic damages to support a Montreal Convention delay claim and dismissing a third party's action brought on behalf of passengers); *Ekufu v. Iberia Airlines*, 2014 WL 87502 at *3 (N.D. Ill. Jan 9,

---

[3] This amount was amended in 2019 to 5,346 Special Drawing Rights per passenger.

2014) (noting no rights of non-passengers to bring claims on behalf of damages suffered by passenger). No case law has expressly found such a right to exist in a third party. *See Id.* (rejecting a claim brought by non-passengers for monetary damages under the Montreal Convention derived from a claim by an actual passenger). Air Engineers was not a "passenger" on any of the flights at issue, but is rather a corporate entity. (Doc. 43 ¶ 2) It cannot piggyback upon the rights of actual passengers on the planes in order to seek damages allegedly incurred on their behalf. *See Ekufu,* 2014 WL 87502 at *3. Air Engineers makes no claims that any individual passenger at all suffered any individual economic damages. As such, Air Engineers does not have standing to pursue these claims on "the legal rights of third parties or interests of third parties."

B.   *Air Engineers' Complaint fails to state a claim for breach of contract against Triumph.*

i.   The breach of contract claim is preempted by the Montreal Convention.

First, Air Engineers cannot succeed on its claim for breach of contract because a state law breach of contract claim is preempted by the Montreal Convention. Article 29 of the Montreal convention states "[i]n the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention.".." Montreal Convention, art. 29. The Eleventh Circuit has held that "Article 29 of the Convention preempts state law actions falling within its scope." *Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1314 n.4 (11th Cir. 2010).

Thus, all state-law claims are preempted where the Montreal Convention applies. The subject matter of the Amended Complaint fits squarely within the Montreal Convention's scope, as Article 19 makes it clear that it covers issues concerning passenger, baggage, and cargo delays:

> The carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take such measures.

Montreal Convention, art. 19. The Amended Complaint deals solely with delays—not total non-performance—in international flights between the United States and the Dominican Republic, both of which are signatories to the Convention. (Am. Compl. ¶¶ 1, 18, 23); *Tirado v. JetBlue Airways Corp.,* 2021 WL 5418049 at *3 (D.P.R. July 8, 2021) (observing that "the United States and the Dominican Republic are both signatories of the Montreal Convention."); *Shabotinsky v. Deutsche Lufthansa AG*, 245 F. Supp. 3d 1018, 1022 (N.D. Ill. 2017)("Claims alleging nonperformance are regarded as claims for breach of contract; claims alleging delay are governed by the Convention.") *Vumbaca v. Terminal One Grp. Ass'n*, 859 F. Supp. 2d 343, 366 (E.D.N.Y. 2012) ("The cases consider 'delay' under Article 19 to mean that the air carrier properly delivered baggage or persons to the <u>appropriate destination</u> but it did so in a [sic] untimely manner.") (emphasis added); *see also We CBD, LLC v. Planet Nine Priv. Air, LLC*, 109 F.4th 295, 306 (4th Cir. 2024) (holding state-law claims to be preempted even where damages "occurred outside the carriage by air period" because "the events causing the [damages] took place during the carriage by air.").[4]

---

[4] Air Engineers also inexplicably claims that the Montreal Convention "sets a floor, not a ceiling" on damages. (Doc. 43.¶ 159). However, this is incorrect, as what Article 22 sets is a maximum amount of damages. It literally states "In the case of damage caused by delay as specified in Article 19 in the carriage of persons, the liability of the carrier for each passenger is *limited* to 4[,]150 Special Drawing Rights." Montreal Convention art. 22(1) (emphasis added). Trying to avoid this plain language, Air Engineers argues that Triumph can stipulate higher limits of liability than what is contained in the Montreal Convention. While true, to "stipulate" requires a clear written intent to waive the Convention's limitations on liability. *Eli Lilly*, 615 F.3d at 1314-17 (holding that parties did not stipulate to waiver of Montreal Convention under multiple agreements where the primary "agreement makes no mention of the Montreal Convention, its predecessor the Warsaw Convention, or to limits on air carrier liability imposed by law.").
Triumph did not choose to exceed that ceiling. The Air Charter Agreement (the "Agreement") between Triumph and Air Engineers does not mention the Montreal Convention at all. Because the Agreement

      ii.  <u>Alternatively, the breach of contract claim fails because Triumph satisfied its obligations under the Agreement.</u>

Even if this Court finds that the breach of contract claim is not preempted by the Convention, Air Engineers cannot succeed on that claim because Triumph satisfied its obligations under the Agreement. To succeed on a claim for breach of contract, a plaintiff must show: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resulting injury to the plaintiff." *Xcel Supply, LLC v. Horowitz*, 2017 IL App (1st) 152277-U, ¶ 46 (citing *Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 2016 IL App (2d) 151053, ¶ 14, 61 N.E.3d 1155, 1159 (2016))[5].

A copy of the Agreement is attached hereto as <u>Exhibit A</u>.[6] Sections 1, 3, and 10 of the Agreement identify Triumph's affirmative obligations to Air Engineers, each of which Triumph satisfied. The Agreement required Triumph to: (i) schedule and arrange flights for Air Engineers' passengers between Birmingham and the Dominican Republic (Section 1); (ii) hire a direct air carrier to operate the flights (Section 3); and (iii) provide alternative solutions for any issues that may arise on the trip (Section 10). Air Engineers acknowledges that Triumph provided a round trip flight from Birmingham to the Dominican Republic and back and that Triumph hired Global X to provide flight services. *See* Am. Complaint ¶¶ 38, 55-56. Triumph also advised Air Engineers of the need to alter the return flight and arranged the accommodations necessary to legally transport

---

does not mention the Convention and does not affirmatively waive its protections, Triumph did not waive the Convention's default rule of limited liability. *Id.*. Air Engineers' assertion that the Agreement could allow higher limits of liability because it "provides for the application of Illinois law and makes no reference to the Montreal Convention" therefore admits Triumph did not waive the Convention's limits on damages. *See Id.* (Doc. 43 ¶ 160.)

[5]    Pursuant to Section 13, the Agreement "shall be governed by the laws of the state of Illinois."

[6]    Although Exhibit A contains a "VOID" watermark from the copy obtained through DocuSign, this is indeed the Agreement. *See* Exhibit A, pp. 3, 5, 6, and 9 (evidencing Jeff Bissell's, the president of Air Engineers, signature and acceptance of the terms).

Air Engineers' passengers to Birmingham. *Id.* at ¶¶ 103, 122. Thus, the allegations in the Amended

Complaint establish that Triumph performed all that was required of it under the Agreement, and

therefore admits there was no material breach. Further, Air Engineers expressly waived Triumph's

liability for delays arising in the ordinary course of air travel.

> (a)    *Air Engineers waived all liability against Triumph for the conduct allegedly giving rise to a breach of contract.*

Even if Triumph had not fully performed, under the express terms of the Agreement Air

Engineers waived any and all liability against Triumph (and Global X) for the actions allegedly

causing the breach.  Global X, described in the Agreement as "the Direct Air Carrier" flew the

passengers from Birmingham to the Dominican Republic and back. While each flight departed and

arrived later than scheduled, the parties anticipated that possibility and reflected that knowledge

in the Agreement. In Section 4, Air Engineers is warned, and agrees, that the "**Schedule may be**

**modified prior to the Initial Departure** by . . . Direct Air Carrier in its sole discretion when

necessary to meet governmental, regulatory, operational, or safety requirements." *See id.*

(emphasis added). Additionally, the Agreement states:

> Direct Air Carrier will make every effort to comply with the contracted departure
> and arrival times stated in the Schedule, **but the departure and arrive times in**
> **the Schedule are subject to aircraft routing, gate space, weather conditions,**
> **and other operational factors**. The actual time of boarding and departure from the
> origin point and all intermediate points of a flight shall be determined by Direct Air
> Carrier, and, while Direct Air Carrier shall use commercially reasonable efforts to
> carry the passengers and baggage in accordance with the Schedule, **Direct Air**
> **Carrier shall not be liable for failure of a flight to depart or arrive according**
> **to any predetermined schedule or routing**.

*Id.* at Section 5(B) (emphasis added). In Section 10 Triumph is yet again reminded about

unexpected delays and schedule changes:

> Occasionally flights are interrupted or modified due to issues beyond the control of
> Triumph Jets. These issues include but are not limited to **maintenance**, weather,

airport closures, etc. Triumph Jets however will not be liable for any additional expenses incurred for a replacement aircraft if required due to weather, **mechanical issues or any other act deemed as Force Majeur**e. Force Majeure includes any delay[ ] or cancellation caused in whole or in part from any acts of God, nature, civil or military authority, terrorism, or threat thereof, strike or labor dispute, damage to or loss of aircraft, **mechanical failure, lack of essential parts or supplies, or any other cause beyond the control of Triumph Jets.**

Exhibit A, Section 10 (emphasis added). In regard to the unplanned stop in Miami to allow the passengers to go through Customs and re-enter the United States, the Agreement anticipated that too. Section 5(B) provides that should "Direct Air Carrier determine[] that the landing is prohibited or restricted by Applicable law, Direct Air Carrier may substitute the nearest appropriate landing facilities." Accordingly, Air Engineers expressly and unequivocally waived any liability arising from a change in travel schedules. Moreover, Air Engineers further agreed that *it* would bear all responsibility for "additional costs incurred as a result of irregular operations or deviation from the standard flight plan resulting from . . . other unforeseen actions as a result of any governmental or aviation authority action." *Id.* at Section 7(D). Finally, the Agreement limited Triumph's liability to the cost of the contract itself. Pursuant to Section 12 of the Agreement:

> UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY PUNITIVE, EXEMPLARY OR OTHER SPECIAL DAMAGES OR FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THIS SECTION SHALL SURVIVE ANY TERMINATION OR EXPIRATION OF THIS AGREEMENT FOR ANY REASON.

Exhibit A, Section 12. Section 12 waives Triumph's liability for punitive, incidental or consequential damages. Thus, Triumph cannot be liable for damages relating to the passengers missing the reception dinner or for the hotel rooms that Air Engineers chose to provide for its passengers when their flight returned to Birmingham. Air Engineers also waived its ability to

recover damages resulting from the time it spent investigating alternative travel arrangements or arising from the loss of the goodwill of its customers.

In sum, Air Engineers agreed to hold Triumph harmless for unforeseen events resulting from the unpredictable nature of air travel. Late arrivals and departures are not actionable under the express terms of the Agreement. Air Engineers contracted for flights, and received them, albeit not on the timeline that it wished for. Air Engineers acknowledged this possibility and agreed not to hold Triumph liable for altered departure and arrival times. Based on the foregoing, and in the alternative that the breach of contract claim was not completely foreclosed by the Montreal Convention, Air Engineers fails to state a claim for breach of contract against Triumph.

C.    *Air Engineers' fraudulent inducement and suppression claims should be dismissed for failure to state a claim.*

Fraudulent inducement requires a plaintiff to show (i) the defendant misrepresented "a material fact concerning the subject matter of the underlying transaction" and (ii) that plaintiff "relied on the misrepresentation to their detriment in executing a document or taking a course of action." *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000) (citing *Reynolds v. Mitchell,* 529 So.2d 227 (Ala.1988)).

To prevail on a claim of suppression, a plaintiff must show "(1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant's suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result." *Alabama Psychiatric Servs., P.C. v. 412 S. Ct. St., LLC*, 81 So. 3d 1239, 1247 (Ala. 2011) (citing *Freightliner, LLC v. Whatley Contract Carriers, LLC,* 932 So.2d 883, 891 (Ala. 2005).

       i.    <u>Air Engineers' claim for fraudulent inducement and suppression based on the apparent unavailability of direct return flights (Count Three)</u>

The Alabama Supreme Court has held that a misrepresentation amounts to fraud when " 'one party[ ] misrepresent[ed] a material fact concerning the subject matter of the underlying transaction and the other party[ ] rel[ied] on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action.' " *Brickhouse Capital, LLC v. Coastal Cryo AL, LLC*, 393 So.3d 467, 473 (Ala. 2023) (quoting *Johnson Mobile Homes of Alabama, Inc. v. Hathcock*, 855 So. 2d 1064, 1067 (Ala. 2003).  The party claiming fraud must also demonstrate that his or her reliance on the misrepresentation was reasonable. *Id.* at 474; *Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Alabama*, 991 So. 2d 701, 706 (Ala. 2008) ("This Court has stated that 'fraudulent-inducement claim[s] [are] governed by the "reasonable-reliance" standard.' " (citation omitted)). Under the reasonable-reliance standard, "a plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents." *Brickhouse Capital, LLC*, 393 So.3d at 474 (quoting *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008).

Air Engineers could not have reasonably relied upon any representations made prior to executing the Agreement because any such representations were rendered null and void by the Agreement. Pursuant to Section 13 of the Agreement, "[t]his Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements." Triumph's only legally binding representations are therefore those contained within the Agreement. *See Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 177, 682 N.E.2d 118, 123 (1997) (finding that an unambiguous merger clause supersedes all prior agreements); *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 662, 891 N.E.2d 1, 19

(2007) (where a contract contains a mergers clause, the terms of the contract "will override any other prior or contemporaneous negotiations between the parties relating to their subject matter").[7]

Air Engineers cannot maintain a claim for suppression based on the non-availability of the return flight because there is no allegation that Triumph knew this information prior to entering into the Agreement. In fact, Air Engineers pleads the opposite, alleging that Triumph learned of the non-availability of customs in Birmingham only after the first flight took place. Am. Compl. ¶ 94. Given that, Triumph cannot be held to have "suppressed" any material fact at the time of contracting, and Air Engineers' claim fails.

> ii.   <u>Air Engineers' claim for fraudulent inducement and suppression based on Triumph's superior knowledge and concealment of Global X's business (Count Four)</u>

As discussed above, in order to state a claim for fraudulent inducement, the party claiming fraud must show that it reasonably relied upon a misrepresentation by the other party to their detriment. *Brickhouse Capital, LLC*, 393 So.3d at 474. There is no claim in the Amended Complaint that Triumph said anything at all about whether Global X participated in deportation flights. Moreover, Triumph had absolutely *no way* of knowing if that fact meant anything to Air Engineers, and there is no allegation stating otherwise. Thus, Air Engineers has not shown how it "reasonably relied" on any fraudulent misrepresentation by Triumph to its detriment.

---

[7]   Similarly, under Alabama law, a merger clause "establish[es] that a written agreement is a completely integrated document, into which all *prior and contemporaneous negotiations* are merged." *Crimson Indus., Inc. v. Kirkland*, 736 So.2d 597, 601 (Ala.1999) (emphasis added); *see also Ex parte Palm Harbor Homes, Inc.*, 798 So.2d 656, 660 (Ala.2001) ("Merger clauses thus create a presumption that the writing represents an integrated, that is, the final and complete, agreement of the parties."); *Harbor Vill. Home Ctr., Inc. v. Thomas*, 882 So. 2d 811, 816 (Ala. 2003) (citations omitted) (same); *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1269 (Ala. 2011) (citations omitted) (same).

Concerning Air Engineers' claim of suppression, the concealment of a fact or the failure to disclose a fact amounts to fraud when there is " '(1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression.' " *Brickhouse Capital, LLC,* 393 So.3d at 475 (quoting *Banks v. SCI Alabama Funeral Servs., Inc.,* 801 So. 2d 20, 24 (Ala. Civ. App. 2001)). These elements can be established if a party actively conceals a material fact or fails to disclose a fact when there is some special reason giving rise to a duty to disclose. *Brickhouse Capital, LLC*, 393 So.3d at 475. A duty to disclose " 'may arise from the confidential relations of the parties or from the particular circumstances of the case.' " *Freightliner, L.L.C. v. Whatley Cont. Carriers, L.L.C.,* 932 So. 2d at 891 (quoting § 6-5-102, Ala. Code 1975). In determining whether there was a duty to disclose, the factors to consider include:

> 1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs' opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.

*Id*. (quoting *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 676-77 (Ala. 2001).

Here, there was not a duty to disclose because what other business ventures Global X might be engaged in is not a "material fact." As the Alabama Supreme Court in *Brickhouse Capital, LLC* stated, a misrepresentation amounts to fraud when " 'one party[ ] misrepresent[ed] a material fact **concerning the subject matter of the underlying transaction** and the other party[ ] rel[ied] on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action.' " *Brickhouse Capital, LLC*, 393 So.3d at 473 (quoting *Johnson Mobile Homes of Alabama, Inc.*, 855 So. 2d at 1067) (emphasis added)). Here, Global X's alleged participation in deportation

flights is not related to the separate flights arranged for under the Agreement. There is no allegation that Global X was going to simultaneously conduct a deportation flight while operating the flights at issue here. Further, this alleged fact does not affect Global X's ability to complete the tasks required of it under the Agreement. If anything, Global X's experience running international flights should have been a positive for someone seeking to charter a company for an international flight.

But even if Global X's outside business ventures constituted a material fact, the Amended Complaint sets forth no allegations that Triumph affirmatively knew that Global X engaged in deportation flights at the time of contracting. Additionally, the Amended Complaint sets forth no allegations that Triumph was aware that Air Engineers had any (moral or otherwise) objection to using a charter company that participates in perfectly legal deportation flights.[8] Triumph and Air Engineers did not have a confidential relationship or have any type of relationship that would require Triumph to disclose this alleged fact, and there is also no requirement in the Agreement or other law that Triumph must disclose to Air Engineers that Global X engages in deportation flights.

## **CONCLUSION**

For the reasons set forth above, Triumph requests that this Court dismiss all claims against Triumph, pursuant to Fed. R. Civ. P. 12(b)(6), including Count One as Air Engineers does not have standing to bring Montreal Convention claims; Count Two as Air Engineers' breach of contract claim is preempted by the Montreal Convention, or, in the alternative, Triumph satisfied its obligations under the Agreement; Count Three as Triumph did not fraudulently induce or suppress information based on the apparent unavailability of direct return flights; and Count Four as Triumph did not fraudulently induce or suppress information concerning Global X's business.

---

[8] Indeed, this count and the allegations purportedly supporting it did not appear in the initial Complaint.

Dated: May 6, 2025

Respectfully Submitted,

*/s/ Todd D. Engelhardt*
Todd D. Engelhardt
Kaitlin R. Parham
R. Benjamin Thomas
ADAMS & REESE
1901 Sixth Avenue North, Suite 1110
Birmingham, Alabama 35203
Phone: (205) 250-5000
Facsimile: (205) 250-5034
Email: todd.engelhardt@arlaw.com
         kaitlin.parham@arlaw.com
         ben.thomas@arlaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2025, I electronically filed the foregoing using the CM/ECF system, which will automatically notify the following counsel of record:

D. Matthew Centeno
Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 458-5378
Facsimile: (205) 458-5100
Email: mcenteno@burr.com
        ddolive@burr.com

*Counsel for Air Engineers LLC*

Benjamin J. Widlanski
Clayton J. Schmitt
KOZYAK, TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Boulevard, Floor 9
Miami, Florida 33134
Telephone: (305) 372-1800
Email: bwidlanski@kttlaw.com
        cschmitt@kttlaw.com

-and-

John Mark White
William Chambers Waller , IV
WHITE ARNOLD & DOWD, PC
2001 Park Place, Suite 1400
Birmingham, Alabama 35203
Telephone: 205-323-1888
Facsimile: 205-323-8907
Email: mwhite@whitearnolddowd.com
        cwaller@whitearnolddowd.com

*Counsel for Global Crossing Airlines, Inc*

*/s/ Todd D. Engelhardt*
OF COUNSEL

17

# EXHIBIT A

DocuSign Envelope ID: 6C939AE7-4D60-4B16-A1BG-D406246E3D3E



1508 Bay Road, unit 1119
Miami Beach, FL 33139, United States



# QUOTE 1686

### Prepared for
Ivy Sharp
ivy@annelilestravel.com

### Prepared by
Triumph Jets, LLC
Arturo Gomez
P.872-333-9444
Charter@TriumphJets.com



---

Aircraft  Airbus  A320

**Date:** 11/13/23

## Itinerary (local time)

| Date | Depart | Arrive | PAX | ETD | ETA | ETE | MI |
|------|--------|--------|-----|-----|-----|-----|-----|
| 04/24/24 | Birmingham, AL, US (KBHM) | La Romana, DO (MDLR) | 162 | 10:00 AM | 02:11 PM | 3:11 | 1,520 |
| 04/28/24 | La Romana, DO (MDLR) | Birmingham, AL, US (KBHM) | 162 | 02:30 PM | 04:41 PM | 3:11 | 1,520 |
| | | | | | | 6:22 | 3,040 |

## Quote

| Item | Rate | Amount |
|------|------|--------|
| Flight cost | 1  @ $225,434.68/trip | $225,434.68 |

### Total $225,434.68



Jeff Bissell
947AA9729B5B48C...

11/15/2023

Signature                                                    Date

**AIR CHARTER AGREEMENT**

THIS **AIR CHARTER AGREEMENT** (the "Agreement") is made and entered into as of August 21st, 2023 by and between Triumph Jets, LLC ("Triumph Jets"), an Illinois limited liability company having its principal operating offices at 1046 N. Damen Avenue, Suite 3N, Chicago, IL 60622 and Air Engineers, LLC ("Client"), an Alabama limited liability company, having its principal operating offices at 7279 Cahaba Valley Rd Birmingham, AL 35242 each of which represents and warrants that it has the necessary corporate/company authority and approvals to enter into this Agreement.

The parties therefore agree as follows:

1. **Services Provided**

Triumph Jets shall schedule and arrange the flights on passenger aircraft ("Aircraft") shown on the attached Annex, configured with the seating shown in the Annex, for Client ("Charter Services"). The Annex shall become part of the Agreement upon the date the Annex is executed by both parties. Additional services may include as applicable: (i) passenger ground transportation; (ii) catering; and (iii) other ancillary services ("Additional Services").

2. **TRIUMPH JETS as Agent & Selection of Direct Air Carrier**

Client hereby appoints Triumph Jets as its agent to arrange for the Charter Services and the Additional Services from a direct air carrier ("Direct Air Carrier"). The client agrees and acknowledges that Triumph Jets does not own or operate the Aircraft.

3. **Direct Carrier**

Triumph Jets shall select a Direct Air Carrier (i) to provide and operate the Aircraft for the transportation of passengers and their accompanying baggage, (ii) in possession of a DOT Certificate of Public Convenience and Necessity and an FAA Air Carrier Certificate and operations specifications to operate under Part 121 of the Federal Aviation Regulations for the services contemplated herein; to provide (iii) complete and fully qualified cockpit crew and cabin crew as required by government authorities for performance of the flights; (iv) flight dispatch and/or flight following; (v) hull and public liability insurance; (vi) complete maintenance, overhaul and repair of the Aircraft; (vii) maintenance support if necessary; (viii) fuel, oil, and other fluids excluding deicing; (vii) navigation and communications services; (ix) Aircraft ground handling at all points; (x) passenger and baggage loading and off-loading; (xi) takeoff, overflight, landing and parking fees; (xii) crew hotel, transport and per-diem; (xiii) Aircraft security; and (xiv) the food and/or beverage service described in the Annex. Direct Air Carrier shall perform the services described in this Agreement in accordance with all applicable laws and governmental regulations, whether they be federal, state, local, foreign, or international operating laws, rules, regulations, directives and requirements, including, but not limited to those of the Federal Aviation Administration ("FAA"), the U.S. Department of Transportation ("DOT"), the Transportation Security Administration ("TSA"), Customs and Border Protection ("CBP") and similar governmental agencies with authority at the airports at which services are performed or with other regulatory authority over the flights on the Schedule (together, "Applicable Law").

4. **Schedule**

The Direct Air Carrier will operate the flights on the schedule (the "Schedule") shown in the Annex, provided that the Direct Air Carrier using commercially reasonable efforts, has been able to obtain all necessary approvals, clearances, permits or operating authorities ("Governmental Approvals") prior to the initial Departure Date (set forth in the Annex). The Schedule may be modified prior to the Initial Departure by (a) mutual agreement of the

Direct Air Carrier and Client, with the agreed Contract Price modified accordingly; or (b) Direct Air Carrier in its sole discretion, when necessary to meet governmental, regulatory, operational, or safety requirements, with any cost increase associated with the deviation to be paid by Client upon notice provided by Triumph Jets of said cost increase and Client's written agreement to said cost increase. In the event, Client does not agree to any cost increase pursuant to this Section, Client, in its sole discretion, may terminate this Agreement effective immediately.

_____Initial

5. **Aircraft Operations**

   Client agrees and acknowledges:

   A. Direct Air Carrier and its pilot-in-command shall have complete authority and discretion over the Aircraft, all matters concerning its preparation and operation, and all flight and cabin crewmembers. All persons and baggage aboard the Aircraft shall be subject to the authority of the Captain and instructions of crewmembers, shall comply with all applicable rules and regulations, including those established by Direct Air Carrier, and may be refused carriage or removed from the Aircraft by Direct Air Carrier, without compensation or liability, for failure to follow such authority, to comply with such rules and regulations, or as reasonably necessary for the safety and comfort of the other passengers or if such passenger is creating a hazard to the passenger, to the flight, to other persons, or to property.

   B. Direct Air Carrier will make every effort to comply with the contracted departure and arrival times stated in the Schedule, but the departure and arrive times in the Schedule are subject to aircraft routing, gate space, weather conditions, and other operational factors. The actual time of boarding and departure from the origin point and all intermediate points of a flight shall be determined by Direct Air Carrier, and, while Direct Air Carrier shall use commercially reasonable efforts to carry the passengers and baggage in accordance with the Schedule, Direct Air Carrier shall not be liable for failure of a flight to depart or arrive according to any predetermined schedule or routing. In the event Client does not have passengers ready for boarding at the time specified by Direct Air Carrier, the flight may proceed without said passengers, and Triumph Jets shall not be liable to Client or the passengers for their transportation or expenses, nor shall Triumph Jets refund any portion of the Contract Price to Client. If in its sole discretion Direct Air Carrier determines that the landing facilities at any point(s) specified in the Schedule are inadequate for safe operations or that landing is prohibited or restricted by Applicable Law, Direct Air Carrier may substitute the nearest appropriate landing facilities, therefore.

   C. Client shall appoint, and provide the contact information listed in the Annex, for a Contact Person who shall be reasonably available to Triumph Jets by telephone to coordinate Client decisions with respect to the flights under this Agreement. Should the Contact Person fail to respond within a reasonable time to a call from Triumph Jets, Triumph Jets is authorized to make such decisions on behalf of Client as are necessary for the safe and successful completion of the flight, and Client ratifies all such decisions and agrees to indemnify and hold Triumph Jets harmless from and against any Losses resulting therefrom.

   D. Any space on the Aircraft available to Client that will not be used by Client may be used by Triumph Jets, without refund or reduction of the Contract Price, for the transport of Triumph Jets personnel and property.

6. **Passenger Requirements**

   A. Client shall act and shall ensure that all passengers boarded at the request of Client act, in full compliance with Applicable Law.

   B. Flights operated by Direct Air Carrier under this Agreement are subject to and governed in all respects by

the Conditions of Carriage as published by Direct Air Carrier on its website from time to time, and such Conditions of Carriage shall be deemed to be fully incorporated by reference herein. Among other things, the Conditions of Carriage restrict the baggage that may be carried, limit the time for submission of passenger claims, and may limit liability to passengers.

C.   Client shall use reasonable efforts to ensure that each passenger: (i) has all required documents for travel including valid and not expired drivers licenses, passports, visas, and similar documentation; (ii) and that all drivers licenses provided as primary form of documentation meet the requirements outlined by the REAL ID Act enacted by Congress in 2005, after the date such requirements become effective; and (iii) will not carry, and his or her baggage will not contain, any hazardous materials, dangerous goods, prohibited items as defined by TSA or other government authorities, contraband, materials, products, or other substances, the importation, possession, transportation, or distribution of which would constitute a violation of Applicable Law. Client shall notify each passenger in advance of the flight as to any government restrictions, limitations, or requirements provided by Triumph Jets or Direct Air Carrier.

D.   Client shall provide Triumph Jets with a Triumph Jets-approved passenger manifest including a partial passenger list 120 hours in advance and a full passenger list that includes all Passenger Name Record data at least 36 hours prior to the scheduled departure time of each passenger-carrying flight conducted pursuant to this Agreement. Triumph Jets will make every reasonable commercial effort to accommodate, but cannot guarantee, that changes to the full passenger list made within 24 hours of scheduled departure time will be approved in time for travel. Client shall maintain Triumph Jet's access to the reservation records after the scheduled departure of a flight, as required by government agencies, so as to permit Triumph Jets to assist passengers in case the charter program is disrupted. For all international flights, Client shall solicit a name and telephone number of a contact (i.e. a person not on the flight or an entity that should be contacted in the event of an aircraft accident, missing aircraft, or act of air piracy ("Aviation Disaster")) from each passenger who is a U.S. citizen to be used only in the case of an Aviation Disaster and shall provide such information to Triumph Jets prior to each flight's departure. Client shall also provide any other necessary information regarding passengers, and any requests for assistance made by passengers with disabilities to Triumph Jets in a timely fashion.

E.   Without limiting the foregoing, Client shall observe, and shall request and use reasonable efforts to ensure all passengers boarded at the request of Client observe, all operating rules of Direct Air Carrie, and to comply with all reasonable instructions of Direct Air Carrier, its employees and agents, and all rules and regulations of relevant government agencies, including those relating to entry and exit documents and TSA's Secure Flight requirements. Direct Air Carrier reserves the right to refuse carriage to any passenger who has failed to comply with such rules, regulations and requirements, and Triumph Jets shall not be responsible to refund any portion of the Contract Price, or for damages of any kind, including but not limited to flight delays or routing changes or passenger displacements, resulting from the failure of Client or any of its passengers to comply with such rules, regulations and requirements. Client shall be responsible for (i) all costs and expenses for passengers who are unable to board because they have not been cleared by TSA or other government authorities or because they fail to comply with such rules, regulations and requirements, including, but not limited to, Direct Air Carrier's security procedures; and (ii) the cost of cleaning, repair or replacement required due to extraordinary wear and tear, damage to, or misuse of the Aircraft or its contents caused by Client or passengers.

F.   Should Client or any passenger or prospective passenger fail to observe any applicable operating rule or regulation of Direct Air Carrier or state, federal, local or government agency, Client agrees and acknowledges that Direct Air Carrier shall have the power and right, at its sole option, to cancel the affected flight or to refuse to board any such person on a flight without liability to Client or such person. Client shall cooperate, and cause any travel agent, tour operator, or other principal or agent involved with the flights to cooperate, in providing any information or certification required by DOT, or by Direct Air Carrier in its efforts to verify compliance with Applicable Law, in respect of this Agreement.


_____Initial

**7.  Client's Financial Obligations**

A.  In consideration of the Charter Services and Additional Services provided by Triumph Jets under this Agreement, Client agrees to pay Triumph Jets the Total Contract Price set forth in the Annex.

B.  Triumph Jets may, at its sole option, use the Deposit to satisfy any financial obligation of Client to Triumph under this Agreement.

C.  *Other Obligation.* Client shall be responsible for paying directly for or providing for the following services obligations:

1.  Other Expenses

  a.  Any present or future taxes, duties, payments, fees, surcharges, and other charges of whatsoever nature in relation to the flights, except charges specifically listed in this Agreement and tax imposed on the overall income of Triumph Jets;

  b.  Any governmental fines or penalties imposed against Direct Carrier and arising out of the flight(s) unless attributable to Triumph's action or inaction;

  c.  All passenger-related expenses incurred in connection with flight delays, re-routings, and cancellations attributable to the Client;

  d.  Aircraft deicing;

  e.  The cost of any incremental service items that Client requests and Triumph Jets agrees to provide.

D.  *Diversion.* Client will be responsible for any additional costs incurred as a result of irregular operations or deviation from the standard flight plan resulting from weather, air space closure, or other unforeseen actions as a result of any governmental or aviation authority action. These costs may include but are not limited to fuel, ground handling fees, landing fees, catering, or overtime.

E.  *Fuel Adjustment Estimate.* The Base Price has been calculated using a Jet Fuel Price per gallon shown in the Annex as the "Baseline Fuel Price." As each flight sequence approaches, Direct Air Carrier shall reasonably estimate its into-plane fuel price per gallon for the flight sequence. Should that estimate differ from the Baseline Fuel Price, Triumph Jets shall notify Client of, and Client shall pay, the corresponding "Fuel Adjustment Estimate" as provided in section 7(H). For planning purposes only, the Annex includes an estimate of the total increase in the Contract Price that may be expected as the Jet Fuel Price increases a certain amount. This will be held in escrow with a refund during the reconciliation period.


_____Initial

F.  *Estimated Taxes and Tax Adjustment Estimate.* Client shall also pay or cause to be paid to Triumph, or directly to the appropriate government agency, all government-imposed taxes, fees, and charges imposed on a per-passenger basis in respect of the flights, including but not limited to those shown in Triumph's estimate of these "Flight Taxes" shown in the Annex. Should Triumph reasonably anticipate Flight Taxes for a Flight Segment that vary from the original estimate, Triumph shall notify Client of, and Client

shall pay, the corresponding "Tax Adjustment Estimate" as provided in section 7(H).

G.  *Adjustment Dates and Full Payment of Adjustment Estimates.* Triumph Jets shall use its best efforts to notify Client in writing of the Fuel and Tax Adjustment Estimates, if any, associated with a flight sequence at least 14 days (if practicable) before such flight sequence is to begin.

H.  *Reconciliation.* After each flight sequence, Triumph Jets and Client shall promptly calculate the amounts, if any, by which: (a) the actual cost of into-plane fuel used for the flight sequence exceeds the estimated cost of fuel reflected in the Base Price any Fuel Adjustment Estimate; and (b) Flight Taxes and any Tax Adjustment Estimates differ from the actual taxes and fees due. Within 30 days, Client shall pay Triumph Jets as a Reconciliation Adjustment any amounts calculated under section 7 and any amounts by which actual taxes and fees exceed the amounts previously paid. Triumph Jets shall refund to Client any amounts by which actual taxes and fees are less than amounts already paid. Payments or refunds under this section shall be due 5 days after the calculation of reconciliation amounts.

_____ Initial

I.  Client acknowledges that it is solely responsible to participants for furnishing all non-flight services offered or sold to participants, and Client is not authorized to request any service or product from any third party for Triumph Jet's account without the prior written consent of Triumph Jets. In the event Triumph Jets assists Client in securing ground transportation, hotel reservations, or other services, Triumph Jets shall act only as Client's agent, Client shall bear the costs of such services and all risks of injury, damage or loss arising out of such services, and Client shall defend, indemnify, and hold Triumph Jets (as defined below) harmless from any Losses asserted against, or incurred by, Triumph when acting in such capacity, except such Losses resulting from Triumph's negligence or willful conduct.

J.  Client's obligation to pay amounts due under this Agreement shall not be affected or reduced by any circumstances, including without limitation, any off-set, counterclaims, recoupment, defense, or other right which Client may have against Triumph, other than as expressly provided in this Agreement.

_____ Initial

## 8. Payment

Client shall be responsible for full payment of the Charter Services and the Additional Services rendered by Triumph Jets in conjunction with this Agreement. Client shall submit payment to Triumph Jets via wire transfer for the Charter Services and Additional Services at the Contract Price and according to the Payment Schedule set forth in the Annex. In no case will any Charter Services or Additional Services be provided to Client prior to any required payments to Triumph Jets.

Payment Instructions: Wire Transfer Information
Bank Name: Byline Bank, 1516 N Wells St., Chicago, IL 60610
Account: 9990192353    ABA Routing Number: 071001533
Company Name/Address: Triumph Jets, LLC 1046 N. Damen Chicago, IL 60622

## 9. Cancellation Policy

A.  Triumph Jets may terminate all or part of this Agreement, or cancel a flight or flights, upon written notice if Client:

1.  commits any material breach of the Agreement, including without limitation a failure to pay any amounts due when due or payable under this Agreement;

2.  makes any material misrepresentation to Triumph Jets;

3.  intends, in Triumph Jet's sole and reasonable determination, to operate a charter that would violate Applicable Law;

4.  ceases operations;

5.  becomes insolvent or otherwise unable to pay or satisfy its debts when and as they become due, becomes bankrupt, goes into liquidation, commits any act of bankruptcy, or enters into an arrangement with its creditors; or

6.  is in default under any other agreement between Triumph Jets and Client.

Any termination of all or any part of this Agreement, or the cancellation of a flight or flights under this section, shall be without prejudice to Triumph Jet's other rights at law or in equity.

B.  Client may terminate all or part of this Agreement, or cancel a flight or flights, upon written notice if Triumph Jets:

1.  commits any material breach of the Agreement;

2.  makes any material misrepresentation to Client;

3.  ceases operations;

4.  becomes insolvent or otherwise unable to pay or satisfy its debts when and as they become due, becomes bankrupt, goes into liquidation, commits any act of bankruptcy, or enters into an arrangement with its creditors; or

5.  is in default under any other agreement between Triumph and Client.

Any termination of all or any part of this Agreement, or the cancellation of a flight or flights under this section, shall be without prejudice to Client's other rights at law or in equity

C.  Triumph Jets may cancel a flight or flights in the event of Force Majeure or other circumstances that make it physically impossible for Direct Air Carrier to perform the flight or flights. Force Majeure includes, without limitation, failure to obtain any required governmental approvals despite reasonable commercial efforts, or the inability to secure landing slots or rights, acts of God, severe weather, strikes, lockouts, or other industrial disturbances, wars, blockades, riots, acts of terror (whether perceived or actual and including threats), quarantine, epidemics, lightning, earthquakes, arrests, explosions, accidents to machinery or aircraft, failure of public utilities, government restraint, or the unavailability of fuel.

D.  Client may terminate all or part of this Agreement, or cancel a flight or flights, for any reason upon reasonable advance written notice to Triumph Jets but subject to Applicable Law and the cancellation charges listed below.

E.  Client may cancel a flight or flights in the event of Force Majeure or other circumstances that make it physically impossible for Client to perform its obligations under this Agreement, excluding Client's payment

of any amounts owed when due hereunder.

F.  The date of cancellation of a flight or flights shall be the date on which (1) Triumph Jets receives notification thereof from the Client, (2) Triumph Jets notifies the Client thereof, or (3) Client ceases operations, regardless of whether Triumph Jets or Client gives notice of cancellation.

G.  Should this Agreement terminate, or should any flight be canceled, pursuant to sections 8(A) or 8(D), Client shall pay to Triumph Jets at the time of termination or cancellation, as liquidated damages and not a penalty:

    1.  all amounts due and owing as of the date of cancellation

    2.  cancellation charges for each affected flight, provided that if cancellation occurs:

        a.  181 days or more prior to an affected flight, the cancellation charge shall be 10% of the Base Price for each affected flight;

        b.  180-61 days prior to an affected flight, the cancellation charge shall be 20% of the Base Price for each affected flight;

        c.  60-31 days prior to an affected flight, the cancellation charge shall be 30% of the Base Price for each affected flight; or

        d.  less than 30 days prior to an affected flight, the cancellation charge shall be 100% of the Base Price for each affected flight.

 Initial

H.  All such amounts and charges may be deducted from any amounts held by Triumph Jets or a third party.

I.  Limitations of liability, and the defense, indemnification, and hold harmless provisions in this Agreement shall survive the termination or expiration of this Agreement. The times of boarding and departure from the origin point and all intermediate points on the charter flight will be determined by Client but are subject to aircraft routing, gate space, weather conditions and other operational factors. In the event that operational constraints and/or airport restrictions prohibit a departure time prior to midnight on the local date shown in this Agreement, Triumph Jets will affect a departure at the closest possible time thereafter. Triumph Jets assumes no obligation to commence or complete transportation within a certain time or according to any specific schedule set forth in this Agreement, and Triumph Jets will not be held liable for failure to do so or for error in any assignment of times of arrival or departure.

## 10.  Partial Completion / Modification of Flights

Occasionally flights are interrupted or modified due to issues beyond the control of Triumph Jets. These issues include but are not limited to maintenance, weather, airport closures, etc. Triumph Jets shall make commercially reasonably efforts to rectify the situation by advising the customer of alternate solutions to accomplish the trip and their costs. Triumph Jets however will not be liable for any additional expenses incurred for a replacement aircraft if required due to weather, mechanical issues or any other act deemed as Force Majeure. Force Majeure includes any delay any or cancellation caused in whole or in part from any acts of God, nature, civil or military authority, terrorism, or threat thereof, strike or labor dispute, damage to or loss of aircraft, mechanical failure, lack of essential parts or supplies, or any cause beyond the control of Triumph Jets.

**11. Indemnification**

Each party shall indemnify, defend and hold harmless the other party and its affiliates, and its and their respective directors, officers, employees, partners, contractors or agents, from an against all claims, demands, suits, actions or other proceedings brought by third parties ("Claims"), and from and against all damages, payments made in settlement, and other liability payable to such third parties, and all costs and expenses incurred (including without limitation reasonable attorneys' fees and expenses), as a result of such Claims (collectively, "Losses"), to the extent such Claims arise out of or are or were caused by the indemnifying party's negligence or willful misconduct. An indemnifying party's obligations under this Section shall not apply to Claims or Losses to the extent such Claims or Losses result from, arise out of or are caused by the willful misconduct or negligence of the party being indemnified. This Section shall survive any termination or expiration of this Agreement for any reason.

**12. Limitation of Liability**

NOT WITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY PUNITIVE, EXEMPLARY OR OTHER SPECIAL DAMAGES OR FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE SUBJECT MATTER HEREOF. THIS SECTION SHALL SURVIVE ANY TERMINATION OR EXPIRATION OF THIS AGREEMENT FOR ANY REASON.

**13. Miscellaneous**

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior oral or written agreements. This Agreement shall be governed by the laws of the State of Illinois. This Agreement is subject to all Applicable Laws. The parties consent to nonexclusive jurisdiction and venue in Illinois. This Agreement binds the parties and their successors and assigns. Any amendments to, revisions of, or waivers of any provisions of this Agreement must be in writing and signed by the party against whom such amendments, revisions or waivers are sought to be enforced. Notices (including service of process) are sufficient if given to the address set forth above by overnight delivery with a nationally recognized carrier, or by facsimile or email transmission. If any provision of this Agreement is held unenforceable by a court, the remainder of the Agreement shall remain effective. This Agreement may be executed in counterparts, each of which shall be deemed an original. Execution and delivery of this agreement by facsimile signature shall have same force and an effect as a manually executed original.

**14. Assignment**

Neither party may assign this Agreement, in whole or in part, without the prior written permission of the other party, which shall not be unreasonably withheld.

**Triumph Jets, LLC**                                      Air Engineers, LLC

_____        _____
Arturo Gomez, Managing Member/CEO        Jeff Bissell, President

DocuSign Envelope ID: 6C939AE7-4D60-4B16-A1BG-D406246E3D3E

# ANNEX TO AIR CHARTER AGREEMENT OF AUGUST 20, 2023 BETWEEN TRIUMPH JETS, LLC AND AIR ENGINEERS, LLC

Issue Date:    11/06/23

This Annex is part of the above-referenced Triumph Jets, LLC Air Charter Agreement, with Conditions of Carriage, that sets forth your rights and obligations; read them carefully. The Agreement is not binding on Triumph unless and until it is signed by both parties and the Initial Deposit has been made by the Due Date.

**1. Client Contact Person.**
        Name:        Arturo Gomez                    Email:  arturo@triumphjets.com
        Telephone:    312-804-1986
2. Aircraft type and Seating.        A320 with Wi-Fi

**3. Charter Type.**    Single Entity

**4. Schedule.**

| Contract Number | Flt Date | Flt No | Departure Airport | Arrival Airport | Ops Type | Departure Time | Arrival Time | Aircraft Type | Pax | Airport Service | Meals & Beverages |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0055-TMJ-0003 | 24-Apr-24 | TBD | BHM | LRM | Live | 12:00L | 16:20L | A320 | 120 | Terminal | C-SK |
| 0055-TMJ-0003 | 28-Apr-24 | TBD | LRM | BHM | Live | 14:00L | 16:50L | A320 | 120 | Terminal | C-Sk |
| | | | | | | | | | | | |

**5. Jet Fuel Price.** Fuel Base $4.00
        Total Estimated Fuel Consumption: 12,350 gallons

**6. Max Payload.  35,000 lbs**

| | |
|---|---|
| Charter Price | $179,216.68 |
| **Estimated Taxes & Fees:** | |
| US Int'l Departure Tax: | $2,700.80 |
| US Int'l Arrival Tax: | $2,700.80 |
| US Pax Facility Charge: | $576.00 |
| US September 11th Fee: | $716.80 |
| US APHIS Pax Fee: | $490.24 |
| US APHIS Aircraft Fee: | $450.00 |
| US Customs User Fee: | $834.56 |
| US Immigration Fee: | $896.00 |
| Int'l Country Fees ($/Pax): | $11,852.80 |
| Total Taxes & Fees | $21,218.00 |
| **Base Price plus Est. Taxes & Fees** | **$200,434.68** |
| Additional Services | Ground Transportation/Catering | TBD |
| Escrow (Estimated Flight Taxes, and Fees and Fuel/Deicing Charges. Held until reconciliation period adjustments ) | **$25,000.00** |
| **Total Contract Amount** | **$225,434.68** |

**9. Payment Schedule.** Subject to change pursuant to Articles 4(e), 4(i) and 4(h) of the Agreement.

| Payment | Due Date | Amount |
|---|---|---|
| Deposit (50%) | Due on Signing | $112,717.34 |
| Balance (50%) | 03/22/24 | $112,717.34 |

**Triumph Jets, LLC**                          **Air Engineers, LLC**



_____          _____
Arturo Gomez, Manager                          Jeff Bissell, President