IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| AIR ENGINEERS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:24-cv-01461-NAD |
| | ) |
| TRIUMPH JETS LLC and GLOBAL | ) |
| CROSSING AIRLINES, INC., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT GLOBAL CROSSING AIRLINES, INC.'S AMENDED MOTION TO DISMISS AMENDED COMPLAINT**

In accordance with the Court's May 7, 2025 Order (Doc. 54), Plaintiff, Air Engineers LLC ("Air Engineers"), opposes the "Amended Motion to Dismiss Amended Complaint" (Doc. 53) filed by Defendant Triumph Jets LLC ("Triumph Jets") and, for its Response, shows as follows:

### I. Introduction & Procedural Background

Air Engineers has sued two entities, Triumph Jets and Global Crossing Airlines, Inc. ("Global X"), seeking recovery for the damages it suffered as a result of the "absolute shit show" (Triumph Jets' own term) involving charter flights that Air Engineers contracted for with Triumph Jets and that Triumph Jets then sub-contracted with Global X to actually provide. Triumph Jets and Global X have both moved to dismiss Air Engineers' Amended Complaint (with Triumph Jets seeking a total dismissal and Global X seeking only a partial dismissal). (*See* Docs. 46 & 53.) Perhaps most notably, Triumph Jets and Global X have taken **contradictory positions** regarding the application here of the Montreal Convention, a treaty governing international air travel.

Global X maintains that Air Engineers may bring at least some Montreal Convention claims arising from the delays encountered with the charter flights and argues:

> The only actual, economic damages that Air Engineers alleges it incurred "for each passenger" are **the hotel rooms** that Air Engineers purchased "for those customer representatives who requested it" due to long drives home in the early hours of the morning. **These are the sort of actual, economic expenses incurred due to delay that the Convention contemplates as being recoverable**, up to Article 22(1)'s limits.

(Doc. 46, Global X Mot. p. 14 n.8 (emphasis added) (citations omitted).)

In contrast, Triumph Jets, having previously ignored the Montreal Convention in its briefing submitted on the original Complaint (*see* Docs. 3 & 25), then changed course at the Court's March 5, 2025 hearing and argued: "It is our position that that we are, you know, as an entity, this falls squarely under the Montreal Convention …." (Doc. 51, Hearing Tr. 9:16-17.) Since that hearing, Air Engineers filed its Amended Complaint (Doc. 43), bringing its claims under the Montreal Convention. Triumph Jets now goes a step further and makes an argument never raised at March 5, 2025 hearing: "Air Engineers does not have standing to bring this action under the Montreal Convention." (Doc. 53, Am. Mot. p. 4.)

Having taken contradictory positions about the application of the Montreal Convention to the hotel rooms here, Triumph Jets and Global X cannot both be right. Air Engineers respectfully submits that Triumph Jets and Global are both wrong about the Montreal Convention and that Air Engineers can bring Montreal Convention claims that seek damages for more than just the hotel rooms. As shown in more detail both below and in Air Engineers' previous Response (Doc. 50) to Global X's Motion to Dismiss (Doc. 46), no portion of the Amended Complaint (Doc. 43) should be dismissed. Therefore, Air Engineers asks the Court to deny Triumph Jets' Amended Motion (Doc. 53) in its entirety.

## II. Argument

A. **Air Engineers, Having Signed the "Air Charter Agreement" and Paid for the Charter Flights at Issue, Has Standing Under the Montreal Convention.**

Article 19 of the Montreal Convention provides, in full:

> **The carrier is liable for damage occasioned by delay** in the carriage by air **of passengers**, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that **could reasonably be required** to avoid the damage or if it was impossible for it or them to take such measures.

Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, T.I.A.S. 13038, 2242 U.N.T.S. 309 (emphasis added). The gist of the Montreal Convention claims in Air Engineers' Amended Complaint is that Air Engineers suffered damages resulting from the delay in the carriage of passengers (Air Engineers' customer representatives) on charter flights to and from the Dominican Republic, and that neither Triumph Jets nor Global X took all measures that "could reasonably be required" in order to avoid those damages. (*See, e.g.,* Doc. 43, Am. Compl. ¶¶ 133-153.)

Triumph Jets argues that Air Engineers cannot pursue those claims because "Air Engineers was not a 'passenger' on any of the flights at issue, but is rather a corporate entity." (Doc. 53, Am. Mot. p. 6.)[1] Contrary to Triumph Jets' argument, though, nothing in the text of Article 19 expressly limits claims "for damage occasioned by delay" to claims brought by "the passengers" themselves. The rest of the Convention text establishes no such limit. Instead, Article 39 of the Convention expressly provides: "The provisions of this chapter apply when a person (hereinafter referred to as **'the contracting carrier'**) as a principal makes a contract of carriage governed by this Convention … **with a person acting on behalf of the passenger** …." (emphasis added).

At the hearing before this Court on March 5, 2025, Triumph Jets admitted that it was a "contracting carrier" for purposes of the Montreal Convention (and that Global X was the "actual carrier"). (*See* Doc. 51, Hearing Tr. 9:7-9.) Thus, because Air Engineers contracted with Triumph

---

[1] Global X has similarly argued, using even more dramatic language, that "[i]t is a simple fact that a corporate entity cannot physically travel on an airplane." (Doc. 52, Reply p. 1.)


Jets to provide the international charter flights for Air Engineers' customer representatives (the passengers), Air Engineers—who paid Triumph Jets a total of $225,434.68 for the charter flights (*see* Doc. 43, Am. Compl. ¶ 42)—has standing to bring claims after it did not get what it paid for and suffered damages as a result of not getting what it paid for.

The cases that Triumph Jets relies on in arguing that Air Engineers lacks standing are distinguishable. Specifically, Triumph Jets cites only two cases that it says discuss "standing" under the Montreal Convention: *Click 2 Refund Inc. v. British Airways PLC*, No. 2:19-cv-05399, 2019 WL 6135123 (C.D. Cal. Nov. 18, 2019), and *Ekufu v. Iberia Airlines*, No. 12 CV 6669, 2014 WL 87502 (N.D. Ill. Jan. 9, 2014). (*See* Doc. 53, Am. Mot. pp. 5-6.)

The *Click 2* case did not address "standing" at all but instead looked at who the "real party in the interest" was. There, four passengers were supposed to travel on British Airways from Berlin, Germany to Boston, Massachusetts, with a layover in London, England. *See Click 2*, 2019 WL 6135123, at *1. The initial flight from Berlin to London was delayed, causing the four passengers to miss their scheduled connecting flight from London to Boston. *See id.* Upon their delayed arrival in London, however, British Airways booked the four passengers on a "substitute flight," and the four passengers, in fact, eventually made it to Boston, albeit four hours later than they would have arrived had they been able to make their original connecting flight. *See id.* The four passengers did **not** document any kind of damages arising from this four-hour delay; instead, they assigned all of their claims to "Click 2 Refund Inc." *See id.*, 2019 WL 6135123, at *2.

Regarding this assignment, the court ruled that Click 2 Refund Inc. was not a real party in interest for purposes of Federal Rule of Civil Procedure 17(a). *See id.* Further, rather than showing any "economic" damages, Click 2 Refund Inc. merely sought damages of €2,400 per passenger under a European Union regulation, EU 261. *See id.*, 2019 WL 6135123, at *1. That particular

claim failed because the court ruled that EU 261 was **not** enforceable in the United States. *See id.*, 2019 WL 6135123, at *3. As a logical consequence of this ruling, the court also granted British Airways' motion for judgment on the pleadings on claims under the Montreal Convention and explained, "Click [2 Refund Inc.] does not allege, for example, that any of the Passengers suffered any out-of-pocket losses, or compensable emotional distress, as a result of the delay," and relied, instead, entirely on the inapplicable EU 261 to claim damages. *Id.*, 2019 WL 6135123, at *5.

Here, unlike the plaintiff in *Click 2*, Air Engineers is **not** claiming to be an "assignee" of the actual passengers. Rather, Air Engineers is suing in its own right, as Article 39 of the Montreal Convention contemplates, over the charter flights it purchased on behalf of its customer representatives (the passengers). Moreover, Air Engineers has pleaded real damages resulting from the delayed flights, starting with the hotel rooms that Air Engineers purchased for its customer representatives when they arrived in Birmingham after midnight in the early morning hours of Monday, April 29, 2024, rather than at the scheduled arrival time of 4:50 pm on Sunday, April 28, 2024. (*See* Doc. 43, Am. Compl. ¶¶ 29 & 148; Doc. 53, p. 28 (Annex to Agreement) (showing arrival time of "16:50L").) Even Global X has conceded that the amounts Air Engineers paid for these hotel rooms are the type of damages that Air Engineers itself may recover under the Convention. (*See* Doc. 46, Mot. p. 14 n.8.) Thus, nothing in the *Click 2* case bars Air Engineers' claims here.

Unlike the *Click 2* case, the *Ekufu* case cited by Triumph Jets did at least analyze standing under the Montreal Convention. However, *Ekufu* is still distinguishable on its facts. In *Ekufu*, a passenger named Gladys Agbasi flew from Lagos, Nigeria, to Chicago, Illinois, with a layover in Madrid, Spain. *See Ekufu*, 2014 WL 87502, at *1. A bag that Ms. Agbasi had checked when boarding her flight in Lagos was a week late arriving in Chicago, and when the bag arrived, some

of its contents were missing. *See id.* Not only did Ms. Agbasi herself sue Iberia Airlines over the items missing from her checked bag, but she was also joined in her lawsuit by her son-in-law and daughter, ThankGod and Loveth Ekufu (the "Ekufus"). *See id.*, 2014 WL 87502, at *2. The Ekufus had not traveled on the flights at issue and had not checked any bags on those flights, but they argued that some of the contents missing from Ms. Agbasi's checked bag belonged to them and that, therefore, they had standing to sue. *See id.*, 2014 WL 87502, at *2. The court disagreed and explained, "The Ekufu Plaintifs, however, were not passengers, **nor parties to the agreement** [with Iberia Airlines], nor directly harmed by Iberia. *Id.*, 2014 WL 87502, at *3 (emphasis added). The court then added, in a footnote: "The Ekufu Plaintiffs do not argue that they have third-party standing to sue in this case, and given that Plaintiff Agbasi is party to the suit, the Court presumes that she is capable of protecting her own interests." *Id.*, 2014 WL 87502, at *3 n.1.

The *Ekufu* case is distinguishable on its facts for the simple reason that Air Engineers—unlike the Ekufus—**was a party to the agreement** (the "Air Charter Agreement," *see* Doc. 53, pp. 20-29) with the "contracting carrier" here.[2] Air Engineers, as the contracting party who paid

---

[2] Triumph Jets attaches to its Amended Motion a copy of the "Air Charter Agreement" and argues that this document "is properly considered at this stage." (Doc. 53, Am. Mot. p. 3 n.2.) Because the "Air Charter Agreement" that Triumph Jets attaches appears to be the same document that Air Engineers' representative signed and is thus the same document that Air Engineers repeatedly cites in its Amended Complaint (*see, e.g.,* Doc. 43, Am. Compl. ¶¶ 26, 29, 33-34, 36, 40-41, 49-54, 160, 162-65), Air Engineers does not object to the Court considering this attachment to Triumph Jets' Amended Motion. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) ("In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged."). In contrast, Air Engineers has objected to the Court considering a similarly named Global X document, called an "Aircraft Charter Services Agreement" (Doc. 46-1), on grounds Air Engineers had not seen the Global X "Aircraft Charter Services Agreement" before this litigation and has no way of knowing, without discovery, whether that document is, in fact, the controlling contract between Global X and Triumph Jets. (*See* Doc. 43, Am. Compl. ¶ 213; Doc. 50, Resp. pp. 13-14.)

for the charter flights at issue (*see* Doc. 43, Am. Compl. ¶ 42), has standing to bring claims after it did not get what it paid for and suffered damages as a result of not getting what it paid for.

> **B.     Air Engineers Also Brings Claims Under Illinois Law, as Provided for in the "Air Charter Agreement," to Supplement the Damages Available Under the Montreal Convention.**

In Count Two (Breach of Contract) and Count Three (Fraudulent Inducement and Suppression Based on the Apparent Unavailability of Direct Return Flights), "Air Engineers seeks additional recovery that may be available under Illinois law, above and beyond the limits on damages that may be imposed by the Montreal Convention." (Doc. 43, Am. Compl. ¶¶ 161 & 174.)[3] The basis for these Counts Two and Three is simple: "Here, the 'Air Charter Agreement' between Air Engineers and Triumph Jets provides for application of Illinois law and makes no reference to the Montreal Convention." (*Id.*, Am. Compl. ¶¶ 160 & 173.) In a footnote to its Amended Motion, Triumph Jets itself admits, "The Air Charter Agreement ('Agreement') does not mention the Montreal Convention at all." (Doc. 53, Am. Mot. p. 7 n.4.)

The reason Air Engineers can bring claims under Illinois law, as specified in the Air Charter Agreement, is because of Articles 25 and 26 of the Montreal Convention. Article 25 provides: "A carrier may stipulate that the contract of carriage shall be subject to higher limits than those provided for in this Convention or to no limits of liability whatsoever." Thus, Article 25 means that contracting parties can stipulate to limits **above those** set forth in Article 22(1) (limiting damages for passengers' delay to a specified amount of "Special Drawing Rights"), even while Article 26 means that parties cannot stipulate to limits **lower than** those set forth in Article 22(1). As one court has explained, "the convention establishes a floor below which the parties may not

---

[3] In Count Five of the Amended Complaint, Air Engineers also brings similar claims against Global X "above and beyond the limits on damages imposed by the Montreal Convention." (Doc. 43, Am. Compl. ¶ 211.)

contract." *Danner v. Int'l Freight Sys. of Wash., LLC*, No. ELH–09–3139, 2013 WL 78101, at *12 (D. Md. Jan. 4, 2013) (citing Articles 25 & 26).

In arguing that Count Two is preempted by the Montreal Convention, Triumph Jets relies on *Eli Lilly & Co. v. Air Express International USA, Inc.*, 615 F.3d 1305 (11th Cir. 2010). Specifically, Triumph Jets argues that *Eli Lilly* means that the "Air Charter Agreement" would have had to expressly mention the Montreal Convention by name in order to waive the damages limits set forth in the Convention. (*See* Doc. 53, Am. Mot., pp. 6-7 & n.4.) However, the *Eli Lilly* case is distinguishable. What happened in *Eli Lilly* is that "DHL and Eli Lilly entered into a long-term service agreement covering a period of five-years beginning on January 1, 2003, eleven months before the Montreal Convention entered into force." *Id.* at 1309. Cargo shipped in December 2004 (after the Montreal Convention had gone into effect) was damaged in transit. *See id.* The court described the issue before it as follows: "The main issue on appeal is whether DHL's liability should be limited to seventeen SDRs [Special Drawing Rights] per kilogram of damages cargo pursuant to Article 22(3) of the Montreal Convention, or whether the long-term service agreement between DHL and Eli Lilly constitutes a stipulation to waive those limits." *Id.* at 1312. Answering this question, the court held that the parties' long-term service agreement was **not** sufficient to evidence or effectuate a waiver of the liability limits set forth in the Montreal Convention. *See id.* at 1316-17.

Among other things, the Warsaw Convention—the treaty in effect when DHL and Eli Lilly had entered their long-term service agreement—did **not** contain a clause akin to Article 25 of the (future) Montreal Convention. *See id.* at 1315. The court reasoned, "Had the parties intended for the service agreement to constitute a stipulation to waive limits on liability, this would not have

been expressly permitted by the Warsaw Convention, and may have been invalid. This suggests that the parties did not intend such a result." *Id.*

In contrast with the facts at issue in *Eli Lilly*, here, when Air Engineers and Triumph Jets entered into their "Air Charter Agreement," the Montreal Convention—and its Article 25—was very much in full force and effect. To argue, as Triumph Jets does, that any agreement setting higher limits on damages above those set forth in the Montreal Convention must expressly mention the Montreal Convention by name would be contrary to the purposes of the Convention. After all, the Montreal Convention—unlike its predecessor, the Warsaw Convention—is intended to favor passengers, rather than airlines. *See Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004). As such, the Montreal Convention does not preempt Air Engineers' claims for additional damages available under the Illinois law specified in the parties' Air Charter Agreement.

### C. Air Engineers Has Pleaded a Breach of the "Air Charter Agreement," and Air Engineers Has Not Waived Its Claims.

Under paragraph 3 of the Air Charter Agreement, Triumph Jets was to select the "Direct Air Carrier." (Doc. 43, Am. Compl. ¶ 49; Doc. 53, p. 20 (Agreement p. 2).) Further, under paragraph 4 of the Agreement, Triumph Jets agreed that this "Direct Air Carrier" was to "us[e] **commercially reasonable** efforts" to "obtain all necessary approvals clearances, permits or operating authorities ('Governmental Approvals') prior to the Initial Departure Date (set forth in the Annex) …." (Doc. 43, Am. Compl. ¶ 51; Doc. 53, p. 20 (Agreement p. 3) (emphasis added).) Further, although paragraph 5.B. of the Agreement purports to limit Triumph Jets' liability "for failure of a flight to depart or arrive in accordance with predetermined schedule or routing," this same paragraph 5.B. also specifies that "the Direct Air Carrier shall use **commercially reasonable** efforts to carry the passengers and baggage in accordance with the Schedule …." (Doc. 43, Am. Compl. ¶ 52; Doc. 53, p. 21 (Agreement p. 3) (emphasis added).)

The allegations of the Amended Complaint are clear: Global X, the "Direct Air Carrier" that Triumph Jets selected under the Air Charter Agreement, did **not** use "commercially reasonable" efforts, and therefore, Triumph Jets breached its own obligations under Air Charter Agreement. For example, as pleaded in the Amended Complaint, Triumph Jets informed Air Engineers (albeit after the fact) that the "standard lead time" for making arrangements with Customs and Border Protection agents to meet an incoming international flight in Birmingham was 30 days in advance, but here, Global X had not provided any notice Customs and Border Protection in Birmingham until nine days before the trip. (*See* Doc. 43, Am. Compl. ¶¶ 95-96.) That was **not** "commercially reasonable." Instead, by Triumph Jets' own admission, the issues with Customs and Border Protection in Birmingham "**could have been flushed out way earlier**." (*Id.*, Am. Compl. ¶ 97 (emphasis added).)

Nevertheless, Triumph Jets argues that "Triumph performed all that was legally required of it under the Agreement" when Triumph Jets "hired Global X to provide flight services" and "advised Air Engineers of the need to alter the return flight and arranged the accommodations necessary to legally transport Air Engineers' passengers to Birmingham." (Doc. 53, Am. Mot. pp. 8-9.)  Nonsense. The references to the "Direct Air Carrier" (here, Global X) using "commercially reasonable efforts" in paragraphs 4 and 5.B. of the Air Charter Agreement are **not** surplus. As Triumph Jets has itself admitted that the issues "could have been flushed out way earlier" (Doc. 43, Am. Compl. ¶ 97), Air Engineers has amply pleaded that Global X did **not** act in a "commercially reasonable" manner and that, therefore, Triumph Jets did **not** fulfill the terms of the "Air Charter Agreement" in selecting the "Direct Air Carrier."

### D. Air Engineers Has Pleaded Fraudulent Inducement and Suppression Based on the Apparent Unavailability of Direct Return Flights.

Triumph Jets does not dispute that it falsely represented to Air Engineers that a direct flight would be possible for the return trip on Sunday, April 28, 2024 but argues that "Air Engineers could not have reasonably relied upon any misrepresentations made prior to executing the agreement because any such representations were rendered null and void by the agreement." (Doc. 53, Am. Mot. p. 12.) However, the Alabama Supreme Court has explained: "[T]he law in this state renders an integration, or merger, clause ineffective to bar parol evidence of fraud in the inducement or procurement of a contract." *Env't Sys., Inc. v. Rexham Corp.*, 624 So.2d 1379, 1383 (Ala. 1993). The law is no different in Illinois, which is the law specified in the Air Charter Agreement:

> While the Illinois Supreme Court has not yet addressed the issue of whether integration clauses themselves suffice to preclude fraud claims, the Seventh Circuit has predicted that were it do so, **it would follow the majority rule that "an integration clause does not bar a fraud claim."** *Kim v. H Guys, LLC*, No. 1:20-CV-03588, 2022 WL 888871, at *4 (N.D. Ill. Mar. 26, 2022) (quoting *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002)). Under this majority rule, a merger clause only limits the evidence available to parties in the case of a dispute over the meaning of a contract; **it has "nothing to do with" whether the contract was induced by fraud**. *Vigortone*, 316 F.3d at 644; *see also Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990) (stating that the parol evidence rule does not block claims of fraud in the inducement); *Budget Rent A Car Corp. v. Genesys Software Sys., Inc.*, No. 96 C 0944, 1997 WL 201549, at *3 (N.D. Ill. Apr. 17, 1997) (holding that the presence of an integration clause alone does not make parol evidence inadmissible to prove a fraud antecedent to a contract).

*SBC Derivatives, LLC v. Bronson*, No. 1:22-CV-2742, 2024 WL 4882032, at *4 (N.D. Ill. Nov. 25, 2024) (emphasis added).

Nevertheless, Triumph Jets argues that "a claim for suppression based on the non-availability of the [direct] return flight" fails "because there is no allegation that Triumph knew

this information prior to entering into the Agreement." (Doc. 54, Am. Mot. p. 13.) Triumph Jets apparently ignores paragraphs 176 and 177 of the Amended Complaint:

> 176. At the time Triumph Jets provided Quote 1686 to Air Engineers on or about November 13, 2023, Triumph Jets **knew or should have known** that Customs and Border Protection agents at BHM typically only worked Monday through Friday and that arrangements would need to be made in order for Customs and Border Protection agents to meet an international flight arriving on a Sunday.
>
> 177. **As one in the business of arranging air charters, Triumph Jets was in a position of superior knowledge and had a duty to disclose to Air Engineers what it knew** about the need to confirm whether or not Customs and Border Protection agents would even be available to meet an international flight arriving at BHM on a Sunday.

(Doc. 43, Am. Compl. ¶¶ 176-77 (emphasis added).) Air Engineers further pleads how it was harmed by Triumph Jets' silence here:

> 182. If Triumph Jets had not represented to Air Engineers that it would be possible to fly direct from LRM to BHM on a Sunday, Air Engineers would have booked its customer representatives on commercial flights.
>
> 183. Alternatively, if Triumph Jets had disclosed, in Quote 1686, the need to make arrangements with Customs and Border Protection agents at BHM to meet an international flight arriving on a Sunday, Air Engineers would have undertaken efforts, before paying $225,434.68 and in advance of the actual air travel, to confirm that those arrangements were, in fact, being made.

(*Id.*, Am. Compl. ¶¶ 182-83.) Thus, Air Engineers has more than adequately pleaded its claims in Count Three.

### E.   Air Engineers Has Pleaded Fraudulent Inducement and Suppression Based on the Triumph Jets' Concealment of the Nature of Global X's Business.

Count Four is different from Air Engineers' other counts against Triumph Jets, because Count Four does **not** rely on the Montreal Convention. Rather, the Quote that Triumph Jets originally provided to Air Engineers promising direct flights both ways bears the name "Triumph Jets / Big Game Air." (Doc. 43, Am. Compl. ¶ 76.) Further, the website for "Big Game Air" explains that "Big Game Air is a premier provider of luxury game day travel experiences for the

ultimate sports fan." (*Id.*, Am. Compl. ¶ 77.) As it turns out, Triumph Jets ended up providing the very opposite of a "luxury … travel experience" and instead subjected Air Engineers' customer representatives to what Triumph Jets itself has described as an "absolute shit show." (*Id.*, Am. Compl. ¶ 123.)

Part of the reason the travel ended up being an "absolute shit show" became apparent after the fact. Global X's "bread and butter," so to speak, is apparently that of "providing aircraft for the US government to use in deporting foreign nationals to other countries …." (*Id.*, Am. Compl. ¶ 192.) Thus, what happened on the flights becomes explainable, albeit not excusable. Here, Air Engineers pleads:

> 193. On information and belief, the overall poor experience that Air Engineers' passengers had on the roundtrip travel between BHM and LRM may have resulted from Global X's relative inexperience in catering to passengers flying by choice, rather than to passengers who were unwilling passengers on deportation flights paid for by the US government.

(*Id.*, Am. Compl. ¶ 193.) For the avoidance of doubt, Air Engineers also pleads:

> 196. Had Air Engineers known about Global X's business, known that Triumph Jets was going to use Global X as its "Direct Air Carrier" under the "Air Charter Agreement," and known that Global X could supply aircraft recently used for US government-funded deportation flights, Air Engineers would not have entered into the "Air Charter Agreement" with Triumph Jets.

(*Id.*, Am. Compl. ¶ 196.)

In moving to dismiss Count Four of the Amended Complaint, Triumph Jets ignores Air Engineers' express pleading and argues, instead, that "what other business ventures Global X might be engaged in is not a material fact" and, further, that there are no allegations in the Amended Complaint that "Triumph was aware that Air Engineers had any (moral or otherwise) objection to using a charter company that participates in perfectly legal deportation flights." (Doc. 53, Am. Mot., pp. 14-15.) Doubling down, Triumph Jets also argues: "If anything, Global X's experience

running international [deportation] flights should have been a positive for someone seeking to charter a company for an international flight." (*Id.*, Am. Mot. p. 15.)

The Court should reject these arguments and instead rely, at the motion-to-dismiss stage, on Air Engineers' own pleading in the Amended Complaint. Air Engineers was led (by Triumph Jets) to believe that it was purchasing "luxury … travel experiences" for its customer representatives. Thus, Air Engineers would **not** have viewed Global X's "experience running international [deportation] flights" as a "positive." Instead, Air Engineers pleads:

> 187.    At and before the time that Triumph Jets entered into its "Air Charter Agreement" with Air Engineers, Triumph Jets knew or should have known that Global X's business consists, in part, of providing aircraft for the US government to use in deporting foreign nationals to other countries.
>
> 188.    This is a material fact that Triumph Jets, by virtue of its business, had a duty to disclose to prospective customers such as Air Engineers.
>
> 189.    The business of providing aircraft for the US government to use in deporting foreign nationals to other countries is very different, for example, from the business of providing "luxury game day travel experiences for the ultimate sports fan."

(Doc. 43, Am. Compl. ¶¶ 187-88.) Based on this pleading, the issues that Triumph Jets now raises cannot be resolved at the motion-to-dismiss stage, and the Court should deny Triumph Jets' Amended Motion (Doc. 53).

### III. Conclusion

For the reasons shown above, Air Engineers asks that the Court deny Triumph Jets' Amended Motion (Doc. 53) in its entirety and permit Air Engineers' claims to proceed to discovery.

Respectfully submitted,

*/s/ Devin C. Dolive*
D. Matthew Centeno (CEN006)
Devin C. Dolive (DOL006)
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, AL 35203
Telephone:  (205) 458-5378
Facsimile:  (205) 458-5100
mcenteno@burr.com
ddolive@burr.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I do hereby certify that I have, on May 21, 2025, electronically filed the foregoing document using the Court's CM/ECF system, which will send electronic notice to the following:

Todd David Engelhardt
Kaitlin Parham
R. Benjamin Thomas, III
ADAMS AND REESE, LLP
1901 6th Avenue North, Ste. 1110
Suite 1110
Birmingham, AL 35203
205-250-5000
Fax: 205-250-5034
Email: jack.spencer@arlaw.com
       todd.engelhardt@arlaw.com

Benjamin J. Widlanski
Clayton J. Schmitt
KOZYAK, TROPIN & THROCKMORTON, LLP
2525 Ponce de Leon Boulevard, Floor 9
Miami, FL 33134
305-372-1800
Email: bwidlanski@kttlaw.com
       cschmitt@kttlaw.com

John Mark White
William Chambers Waller, IV
WHITE ARNOLD & DOWD, PC
2001 Park Place, Ste. 1400
Birmingham, AL 35203
205-323-1888
Fax: 205-323-8907
Email: mwhite@whitearnolddowd.com
       cwaller@whitearnolddowd.com

                                      */s/ Devin C. Dolive*
                                      OF COUNSEL